LAKE ERIE ALLIANCE FOR the PROTECTION OF the COASTAL CORRIDOR, Downwind Neighbors, George E. Limberty, John McNicol, Local 1330, United Steelworkers of America Local 1397, United Steelworkers of America Local 1462, United Steelworkers of America Tristate Conference of the Impact of Steel on Ohio-Pennsylvania-West Virginia, Concerned Citizens of Conneaut, Earl Weaver, Tom and Mary Meara, Gerald Specht and Chuck Gaukel, Plaintiffs,

v.

U. S. ARMY CORPS OF ENGINEERS Clifford L. Alexander, Jr., Lt. Gen. John W. Morris, Daniel D. Ludwig, George P. Johnson, Paul G. Leuchner, Defendants,

and

U. S. Steel Corporation, Intervenor.

Civ. A. No. 79–110 Erie.

United States District Court, W. D. Pennsylvania.

Nov. 23, 1981.

Brent English, Cleveland, Ohio, for Lake Erie Alliance for the Protection of the Coastal Corridor.

Staughton Lynd, Youngstown, Ohio, for TriState Conference.

James Denney, Youngstown, Ohio, for Locals 1330, 1397 and 1462, USWA and John McNicol.

Michael Healey, Pittsburgh, Pa., for USSW of America, Local U. 1397 of Homestead, Pa.

Thomas Kennedy, Pittsburgh, Pa., for Lake Erie Alliance, Downwind Neighbors and Concerned Citizens of Conneaut.

Craig McKay, Pittsburgh, Pa., for U. S. Army Corp. of Engineers, Clifford Alexander, John W. Morris, Daniel D. Ludwig, George P. Johnson and Paul G. Leuchner.

Thomas Wright, Pittsburgh, Pa., for U. S. Steel Corp., defendant-intervenor.

## OPINION

WEBER, Chief Judge.

On July 19, 1979, plaintiffs filed a complaint for declaratory and injunctive relief alleging numerous violations of federal laws in connection with the issuance of construction permit No. 77–492–3 granted to United States Steel Corporation (U.S. Steel) by the United States Army Corps of Engineers for the construction of piers in Lake Erie, dredging, the installation of intake and discharge structures into its waters, and diversion of a stream leading into Lake Erie, all in connection with a proposal to construct a steelmill at this site. Plaintiffs are comprised of environmentally concerned organizations, individuals living near the site of the proposed project, unemployed steelworkers and unions affiliated with the United Steelworkers of America. Named defendants include the United States Army Corps of Engineers (the Corps) and five officers of the United States. Jurisdiction is predicated on, *inter alia*, 28 U.S.C. § 1331(a) and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* (hereinafter the APA). U.S.Steel formally intervened on September 10, 1980.

The case is presently before us on cross motions for summary judgment. Arguments were heard orally before the late William W. Knox, District Judge, on July 1, 1981, and voluminous briefs, reply briefs and appendices have been submitted by

both sides, in addition to the draft environmental impact statement (EIS), the final EIS, and portions of the administrative record. Upon the death of Judge Knox, the case was transferred to me, and although I have not been involved with this litigation from its incipiency, nor heard the arguments of counsel, the issues involved and the positions of the parties are presented sufficiently on paper for me to rule on the motions.

## Background

On March 2, 1977, at a meeting in Pittsburgh, Pennsylvania, U.S.Steel announced a plan to construct a steelmaking facility on a 2,800 acre site astride the Ohio-Pennsylvania border near Conneaut, Ohio. At the meeting, representatives of U.S.Steel submitted to the Corps an application for a Department of Army Permit authorizing extension of the privately owned East Entrance Pier of Conneaut Harbor, construction of an unloading pier, dredging of an area near the pier, installation of intake and discharge structures in Lake Erie, and diversion and filling of a lower portion of Turkey Creek. At this time U.S.Army Brigadier General Moore designated the Corps, Buffalo, New York District Office, as lead agency for preparation of an EIS for the project.

The Corps immediately assembled a Technical Team composed of representatives of the Corps, the United States Environmental Protection Agency (U.S. EPA) the State of Ohio, the Commonwealth of Pennsylvania, the United States Fish and Wildlife Service, the Federal Regional Counsel, and the National Marine Fisheries Service, to assist in the identification and evaluation of environmental issues, development of on-site sampling studies, and analysis of environmental data used in the EIS. The team was also to provide technical expertise in the areas of air quality, water quality, land use planning, fish and wildlife resource management, and a variety of other related fields. The Technical Team was to evaluate all data furnished to it by U.S.Steel and advise U.S.Steel and its prime consultant, Arthur

D. Little Company (A.D. Little), on the types of information necessary to prepare an EIS. To facilitate communications between the Technical Team, U.S.Steel and A.D. Little, representatives of both private companies were invited to sit on the Technical Team.

The Corps issued public notice of the proposed project on March 11, 1977 and commenced a program of meetings, workshops, public hearings, environmental studies, and public comment periods, culminating in the filing of the initial environment assessment by U.S.Steel on July 5, 1978. In response to the environment assessment by U.S.Steel and A.D. Little, the Corps conducted environmental studies, retained consultants, held public meetings, symposiums and workshops, evaluated and addressed public comments, and compiled thousands of documents. These efforts resulted in the draft EIS which the Corps filed as a matter of public record on May 23, 1978. Public comments on it were received for four months thereafter.

The Corps next undertook the production of the final EIS, compiling more studies, holding further public hearings, and receiving additional comments. On April 26, 1979, the Corps submitted the final EIS as a matter of public record. Almost two months later, on June 18, 1979, the Corps issued a construction permit to U.S.Steel. Undergirding the decision of the Corps to issue a permit to U.S.Steel are 42,000 pages of documents, constituting an administrative record more than sixteen feet thick.

One month later, this action was commenced with the filing of a fifty-five page complaint for declaratory and injunctive relief. An amended complaint, of similar substance and length, was filed on November 23, 1979. The amended complaint is in seven counts, comprised primarily of challenges to the adequacy of the final EIS under the National Environmental Policy Act of 1969, § 2, 42 U.S.C. § 4321, *et seq.* (NEPA), violations of the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, violations of the Fish and Wildlife Coordination Act, 16 U.S.C. § 661, *et seq.*, the Migratory Bird

Act, 16 U.S.C. § 701, *et seq.*, and the APA. Plaintiffs seek a judgment declaring that the EIS on the Lakefront project is inadequate and injunctive relief rescinding permit 77–492–3 until a new EIS is prepared. Plaintiffs also seek injunctive relief rescinding the certification under § 401 of the Clean Water Act.

Defendants move for summary judgment on the grounds that the Corps' exhaustive two-year preparation of the EIS and concommitant issuance of permit No. 77–492–3 was completely in accordance with the law and in no way arbitrary, capricious or otherwise an abuse of discretion. Plaintiffs responded to defendants motion with a motion for partial summary judgment and objecting to the entry of summary judgment on all other issues.

■ Earlier in this litigation while ruling on a discovery motion, the court recognized that its scope of review is limited to the administrative record, unless it appears *from the record* that inadequate consideration has been given to matters raised. *Lake Erie Alliance for the Protection of the Coastal Corridor, et al. v. United States Army Corps of Engineers, et al.*, Civil Action No. 79–110 Erie (W.D.Pa. Feb. 5, 1981).

■ The guidelines for our review are more succinctly set forth in *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) where the Supreme Court reiterated earlier holdings that NEPA imposes upon agencies duties that are "essentially procedural" and cautioned that once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences. The court is not to interject itself within the area of agency discretion. *Id.* Therefore, the focal point for our review is the administrative record already in existence and not some new record made initially in the reviewing court. *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Summary judgment may be properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is warranted only on a clear showing that no genuine issue of any material fact remains for trial. *Ely v. Hall's Motor Transport Co.*, 590 F.2d 62, 66 (3d Cir. 1978). Moreover, the existence of disputed issues of material fact should be ascertained by resolving all doubts against the moving party. *Id.* However, in light of the limited role of the court in reviewing the administrative record already in existence, this is the type of case which is well suited for summary judgment.

### NEPA Issues

Turning to the substantive elements of plaintiffs' claims as they appear in the complaint, the first cause of action alleges that preparation of the EIS violated the requirements of NEPA ·in numerous instances. Several NEPA violations serve as the basis for distinct counts in the complaint and will be discussed separately. Those which do not can be categorized as environmental concerns. Plaintiffs contend that the consideration given to air quality impacts, solid waste impacts, erosion impacts, water quality impacts, and impacts on land and human resources was "woefully inadequate".

■ Plaintiffs contend that the air emissions inventory is deficient because U.S. Steel refused to conduct studies which would be required by the U.S. EPA prior to issuing a permit under the Clean Air Act due to prohibitive costs. In addition, inaccuracies in U.S.Steel's baseline air quality data caused the Corps to be "hornswaggled" by the applicant into accepting data which the U.S. EPA later determined to be inadequate. Plaintiffs also allege that defendants failed to discuss the biological effects of air pollution from the operation of the proposed plant and that the Corps tried to "shuffle off" on the U.S. EPA consideration of offsets.

The EIS devotes over 80 pages to studying the effects of the proposed project on the air quality. The statement describes a meteorological and air quality monitoring program which was instituted by Environmental Research and Technology, Inc. to determine baseline air quality at the proposed plant site. The EIS discusses the program in detail, including procedures implemented by the Corps to insure equipment was working properly and that data was accurate. EIS, Vol. II, pp. 2–751, 2–756. Plaintiffs' contentions that the air emissions inventory is deficient or that the baseline air quality data is inaccurate are insufficient to overcome defendant's motion for summary judgment. The possibility of inaccuracies in data always exists, and despite the rigorous requirements of NEPA, perfection is not required. *Environmental Defense Fund v. Tennessee Valley Authority*, 492 F.2d 466 (6th Cir. 1974).

■ NEPA requires an EIS to discuss certain factors in sufficient detail to enable the decision makers to make a reasoned decision. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The decision may be a complete blunder as long as it is a knowledgeable one. *Matsumoto v. Brinegar*, 568 F.2d 1289 (9th Cir. 1978). Plaintiffs' Brief highlights portions of the Administrative Record showing that the analysis concerning air pollution was designed to provide enough information to cover the EIS and to enable the Corps of Engineers to perform its duty under NEPA. Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at page 38. Further, any deficiencies in data were made known to the decision makers, to enable them to make a reasonable decision.

■ The EIS included a lengthy discussion of primary impacts of facility operations on air emissions and the long-term effects of emissions on human health, vegetation and wild life. See EIS, Vol. III, pp. 4–815 through 4–848. The EIS on its face shows that the plaintiffs' complaints that the Corps failed to adequately discuss the biological effects of air pollution are without merit.

Plaintiffs next challenge the consideration given to solid waste impacts by the Corps. Specifically, they challenge the propriety of adopting the applicants' position that precise sites for waste deposits would be selected at a later time after "more detailed hydro-geologic surveys of prospective areas." Apparently, the Corps should have insisted that U.S.Steel identify the precise areas where waste would be deposited and require the production of detailed studies prior to issuing the permit.

■ The final EIS, Vol. I, pp. 1–251 through 1–257, discusses each of eight areas identified as potential disposal sites, includes a site map showing their location, and states that seven of them appear capable of handling greater than twice the estimated waste over the life of the plant. Three of the applicants' choices were rejected because they conflicted with the Fish and Wildlife Mitigation Plan developed by the Corps. The EIS assures that during the continued process of selecting a suitable site for waste deposits, the applicant would be required to conform to the site selection and construction requirements set forth in the pertinent statutes. This is sufficient consideration under NEPA.

In addition, plaintiffs allege that the EIS is deficient because no specific erosion control plans were specified. Rather, the Corps estimated the erosion rate and referred to an on-site erosion control program to be developed by the applicant. Also, plaintiffs contend that it should have been made "crystal clear" in the EIS which areas of the site would be exempted from expansion and preserved as wildlife sanctuaries.

■ NEPA imposes affirmative obligations on an agency to seek out information concerning environmental consequences, but does not specify the quantum of information that must be in the hands of the decision maker before he decides to issue a permit. *Alaska v. Andrus*, 580 F.2d 465 (D.C.Cir.1978), *vacated in part on other grounds*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1979). The EIS is to provide

the decision maker with a detailed and careful analysis of the relative environmental merits and demerits of proposed action. It does not impose a requirement of perfection, nor does it require that all environmental impacts be known. *Environmental Defense Fund, Inc. v. Costle,* 439 F.Supp. 980 (E.D.N.Y.1977).

■ Despite divergent population projections and a consensus recommendation that an alternative to the A.D. Little population study be presented, plaintiffs complain that the Corps accepted the A.D. Little study with no independent evaluation. Therefore, insufficient consideration was given to impacts of the plant on human resources.

The EIS does not support plaintiffs' position. A substantial part of Chapter 4 is devoted to the impact of the plant on the human environment. More specifically, population projections and the effects of population increases on a myriad of factors including, *inter alia,* housing, school systems, sewage systems, law enforcement, fire protection, property taxes, property evaluations, electricity demands, natural gas demands, etc. are considered in relation to both Pennsylvania and Ohio. EIS, Vol. III, pp. 4–1 through 4–510. Careful study of the EIS, especially Volume III, pages 4–103 through 4–106, indicates that the plaintiffs' contentions are without merit. The Corps acknowledges that population studies are speculative at best and that different statistics were received from different sources. A number of governmental agencies submitted independent population projections to the Corps differing from the private study received from A.D. Little. In an attempt to meet this criticism and present the reviewer with some perspective on the different figures offered by the various plans and studies, the EIS includes a chart with multipliers which can be used to estimate the range of possible effects of population growth from the plant.

The plaintiffs' final environmental criticism of the EIS is that it inadequately considered construction and operation impacts of the plant on water quality. To the extent that the argument advanced in plaintiffs' briefs are not covered elsewhere in this opinion, we need only cite to the EIS, Vol. III, pp. 4–643 through 4–80⁸ to support defendants' position that the environmental impact statement is adequate in its consideration of impacts on water quality.

Plaintiffs are of the opinion that summary judgment is inappropriate on each of these environmental issues because there are genuine issues of material fact in dispute as to the adequacy of the Corps' consideration. Plaintiffs offer nothing specific to indicate what facts are in dispute. The record clearly reveals what the Corps did and did not do during the permitting process in its consideration of each issue raised. Reviewing that record to determine the adequacy of their consideration is strictly a legal matter within the province of the court. Having done so, we are satisfied from the record that the defendants adequately took into consideration the impact of the plant on air, land and water quality as well as human resources.

Plaintiffs true complaint is that the conclusion reached by the defendants was contrary to the conclusion that plaintiffs would have reached. While we are sympathetic with the concerns of the plaintiffs, the Supreme Court has left little doubt as to the role of the courts in reviewing the sufficiency of an agency's consideration of environmental factors. *Vermont Yankee Nuclear Power Corp., v. NRDC, supra.* "Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). NEPA imposes upon agencies duties that are essentially procedural and the Act was designed to insure a fully-informed and well-considered decision, but not necessarily one which the judge or judges of the reviewing courts would have reached had they been members of the decision making unit. *Stryckers Bay Neighborhood Council, Inc. v. Karlen, supra.*

■ Once an agency has made a decision subject to NEPA's procedural requirements, the court is only to insure that the agency has considered the environmental consequences and is not to interject itself within the area of the discretion of the executive as to the choice of the action to be taken. *Id.* 444 U.S. at 227–228, 100 S.Ct. at 500. Further, the only procedural requirements proposed by NEPA are those stated in the plain language of the Act. *Kleppe v. Sierra Club, supra,* 427 U.S. at 405–406, 96 S.Ct. at 2728. NEPA requires that the agency shall "include in every recommendation or report on proposals . . . significantly affecting the quality of the human environment a detailed statement by the responsible official on . . . the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C)(i). The detail must be sufficient to show that the agency made a good faith effort to consider the values NEPA seeks to protect by cataloguing environmental factors and explaining fully the agency's course of inquiry, analysis and reasoning. *Philadelphia Council of Neighborhood Organizations v. Coleman,* 437 F.Supp. 1341 (E.D.Pa.1977) *aff'd without opinion,* 578 F.2d 1375 (3d Cir. 1977).

The Administrative Record and the Environmental Impact Statement more than adequately demonstrate compliance with NEPA and therefore summary judgment will be entered for the defendant as to each of these environmental matters.

### Alternatives

■ Plaintiffs' second cause of action charges defendants with violating NEPA by failing to adequately examine alternatives to the proposed plant. Cross motions for partial summary judgment on this issue were denied earlier by the Judge W. Knox because the record at that time was incomplete. *Lake Erie Alliance for the Protection of The Coastal Corridor, et al. v. U. S. Army Corps of Engineers, et al.,* Civil Action No. 79–110, (W.D.Pa. Sept. 10, 1980). Since that time, the record has been clarified and augmented and is now in a posture for entry of summary judgment. Plaintiffs

reverse their earlier position that there are no material issues of fact in dispute on the alternatives issue and urge the court to deny defendants' motion for summary judgment on this question because their experts disagree with the defendants' experts on the viability of alternative sites. However, disagreement among experts, even if proven after a full trial on the merits, would not serve to invalidate the EIS. *Life of the Land v. Brinegar,* 485 F.2d 460, 472, (9th Cir. 1973), *cert. denied* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The purpose of the EIS is to inform the decision makers of the environmental ramifications of the proposed action and the statement need not achieve scientific unanimity. *Id.*

Plaintiffs' main contention is that the analysis of alternatives presented in the EIS is deficient since it did not include a study of partial alternatives. Instead of one large plant, plaintiffs suggest that building two smaller plants, or expanding existing plants and constructing a smaller Greenfield one at Conneaut is both reasonable and feasible. They further argue that the EIS is fatally flawed because the Corps failed to make an objective inquiry into the total cost of the proposed project or to review cost studies performed by others.

NEPA directs that all agencies of the federal government shall "include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment a detailed statement by the responsible official on . . . alternatives to the proposed action". 42 U.S.C. § 4332(2)(C)(iii).

■ Federal regulations consider the comparison of alternatives to a proposed action to be at the "heart of the environmental impact statement". 40 C.F.R. § 1502.14 (1980). However, NEPA's requirement that alternatives be studied, developed and described is subject to a rule of reason. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. at 551, 98 S.Ct. at 1215. The Supreme Court has recognized that the impact statement must be bounded by some notion of feasibility. *Id.* Accordingly, numerous courts have held that there

is no need for an EIS to consider an alternative whose effect cannot reasonably be ascertained and whose implementation is deemed remote and speculative. *NRDC v. Morton*, 458 F.2d 827, 838 (D.C.Cir.1972); *Fayetteville Area Chamber of Commerce v. Volpe*, 515 F.2d 1021 (4th Cir. 1975), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140; *Committee for Nuclear Responsibility Inc. v. Seaborg*, 463 F.2d 783, 787 (D.C.Cir.1971).

■ The EIS devotes 130 pages to the consideration of alternatives to the proposed project. These alternatives include no action, rearrangement of plant layout, alternative process units, alternative plant operation concepts, alternative sites, alternative processes, alternative ancillary facilities, alternative solid waste management systems, alternative operation and maintenance methodologies, alternative intake and discharge systems, alternatives to the original proposal to fill and divert Turkey Creek, and alternative pier extension and dock design. Alternative "Brownfield" sites in Chicago, Illinois, Gary, Indiana, Youngstown and Lorain, Ohio were considered. Greenfield sites along the Great Lakes Shoreline in Indiana, Illinois, New York, Ohio and Pennsylvania were studied. All were rejected because the Corps determined that, although feasible for some degree of industrial expansion, they offered no advantage over the Conneaut site due to social, economic and environmental problems. EIS, Vol. IV at 6–69.

According to the administrative record before us, there is nothing to indicate that plaintiffs, or anyone else, forcefully brought such partial alternatives to the attention of the defendants during the compilation of the draft or the final EIS. However, the impact statement does indicate that partial alternatives were considered but the Corps did not find them preferable socially, economically or environmentally. Taken together with the fact that U. S. Steel did not want to modernize, add on, or build two small plants, this alternative now pressed by the plaintiffs could hardly be considered anything other than remote or

speculative and we believe that under the rule of reason, the brief statement concerning partial alternatives in the EIS is adequate. *Philadelphia Council of Neighborhood Organizations v. Coleman*, 437 F.Supp. 1341, 1365 (E.D.Pa.1977). The agency need not ferret out every possible alternative but must only consider those which are forcefully presented and bounded by some notion of feasibility. *Vermont Yankee Nuclear Power Corp. v. NRDC, supra.* The administrative record convincingly shows that the Corps gave reasonable consideration to a large number of alternative sites and potential methods for U. S. Steel to meet its needs of future expansion. Having done so, it has satisfied NEPA's procedural mandate on this issue.

### Delegation Issues

Plaintiffs allege in the third cause of action that the presence of U. S. Steel and its consultant, A.D. Little, on the Technical Team was an improper delegation of the agency's responsibilities. They argue that the team relied on factually unsupported statements by U. S. Steel during the preparation of the EIS and therefore the Corps abdicated its primary and nondelegable duty by substituting the applicant's evaluations for its own. Plaintiffs contend that this issue is not proper for summary judgment yet point to no specifics to support their position.

Under the provisions of NEPA, the federal official charged with implementing the provisions of the Act remains responsible for the scope, objectivity and content of the EIS. 42 U.S.C. § 4332(2)(D)(iii). This requirement is to insure that the final EIS will not be based upon self-serving assumptions submitted by the applicant. *Green County Planning Board v. Federal Power Commission*, 455 F.2d 412, 420 (2d Cir. 1972), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1973). Both the guidelines of the Council on Environmental Quality (CEQ) and the Corps' own regulations specifically allow an agency to rely on an applicant for environmental data. *See*, 40 C.F.R. § 1500.7; 33 C.F.R. § 209.410(e)(8).

According to the final EIS, it became apparent during the review of the U. S. Steel permit application that a multidisciplinary evaluation would be required to identify and define the environmental impacts associated with the construction and operation of the proposed steel mill. In order to perform such an evaluation, the Corps decided to bring together representatives from a number of state and federal agencies with specialized expertise in the various technical disciplines. To facilitate communication and avoid duplication of efforts, U. S. Steel and A. D. Little were invited to sit in on the Technical Team.

Plaintiffs concede that there is nothing inherently improper or illegal with the technical team concept or in coordinating information with the permit applicant. Plaintiffs do not agree, however, that the applicant should be seated as a member of the Technical Team and argue that its intimate involvement at the policy-making level tainted all actions of the inter-agency team. They complain more specifically that the Corps did not independently verify crucial information, that nearly 80% of the first two chapters of the final EIS were adopted verbatim from the A.D. Little report, and that the Corps requested the applicant to respond to approximately 60% of the comments received on the draft EIS.

Nothing in NEPA or the regulations says that the agency cannot adopt a report furnished by the applicant in whole or in part. The Act only requires that the defendants take responsibility for the scope and content and make their own evaluation of the environmental issues. It need not be entirely the Corps' own work product. *Sierra Club v. Lynn*, 502 F.2d 43, (5th Cir. 1974). In the absence of bad faith or misplaced reliance, an agency cannot be expected to ignore useful and relevant information merely because it emanates from an applicant. *Id.* While this does not mean that the agency may substitute the applicant's analysis for its own, a duplication of effort would be a needless waste of government time and money. The procedure followed by the Corps ensured that they main-tained control over how the information was to be received from the applicant and, if the agency determined it to be appropriate, incorporated in the EIS. *See* Appendix to Plaintiffs' Brief, Vol. 4 at 138–140.

The final EIS indicates that hundreds of letters were sent out to both private and public agencies requesting comments on the draft EIS. These letters and responses comprise nearly 200 pages in the EIS. After extending the period for reviewing the draft EIS and receiving public comments by an additional 45 days, the agency requested that U. S. Steel aid in preparing responses to the numerous comments that had been received. In a letter dated September 18, 1978, Col. Daniel D. Ludwig solicits the aid of Stephen P. Curtiss of U. S. Steel, in responding to comments, stating that, "[m]y staff will evaluate each response to insure that it is suitable for inclusion in the final EIS. In addition, your response will be forwarded to the reviewing agencies for evaluation and concurrence. Those responses deemed unacceptable by my staff or agency officials will be returned to you for further input." Colonel Ludwig also states that "[t]he final environmental impact statement will not be issued until I am fully satisfied that all primary and secondary impact issues, alternatives, monitoring proposals and on-site mitigation matters have been adequately addressed." Appendix to Plaintiffs' Brief, Vol. 4, at 152.

We are satisfied that the Corps met its obligations under NEPA to independently and objectively evaluate all studies and data. The record indicates that reports received from A.D. Little were reviewed by numerous agencies including the Corps of Engineers, that the data and conclusions contained in the draft EIS were scrutinized for validity and accuracy during the formal public interest review period, that additional studies were carried out in response to these comments and that the final EIS was more than a collation of comments and self-serving statements supplied by the applicant.

## 1074

*Violations of Sections 401 and 404 of the Clean Water Act*

The next cause of action in the complaint alleges three violations of the Federal Water Pollution Control Act, commonly known as the Clean Water Act, 33 U.S.C. § 1251, *et seq.* The first violation alleged is that U. S. Steel failed to obtain a valid Section 401 certification from the State of Ohio. Section 401 of the Clean Water Act requires an applicant for a federal license to conduct any activity, including the construction or operation of facilities which may result in discharge into navigable waters, to provide the licensing agency with a certification from the state in which the discharge originates. 33 U.S.C. § 1341(a)(1). U. S. Steel obtained a 401 certification from the State of Ohio on May 4, 1979, and a subsequent certification was reissued on June 19, 1979, to clarify the earlier one. Plaintiffs contend that this certification was invalid.

On January 30, 1980, Judge Knox dismissed plaintiffs' complaint against James McAvoy, Director of Ohio Environmental Agency, and the Ohio Environmental Protection Agency for lack of venue. Subsequently, plaintiffs filed a similar action against the Ohio defendants before the Ohio Environmental Board of Review (OEBR).

The OEBR considered *de novo* plaintiffs' allegations that the 401 certification from Ohio was invalid and found in favor of the director of the Ohio EPA on every issue. *Lake Erie Alliance v. McAvoy*, Case No. EBR 79-63 (January 4, 1980). The decision of the OEBR was affirmed by the Court of Appeals of Franklin County, Ohio, —— Ohio App.2d ——, (Aug. 28, 1980), *cert. denied*, —— Ohio St.2d ——, (Dec. 31, 1980). Defendants contend that the decision of the Ohio courts that the section 401 certification in question is both reasonable and lawful, is res judicata and may not be challenged in this court.

Res judicata makes conclusive a final valid judgment, and if the judgment is on the merits, precludes further litigation of the same cause of action by the parties.

*Antonioli v. Lehigh Coal and Navigation Co.*, 451 F.2d 1171, 1196 (3d Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972). In the Ohio case, there was substantial identity of the parties, or those in privity with them, with those of the instant action and there is no question but that the Ohio decision was a final one on the merits. Plaintiffs contend that res judicata does not apply here since the OEBR declined to consider whether the 401 certification satisfied the federal EPA regulations.

On the contrary, both the administrative board and the appellate courts considered the question and decided that in issuing a 401 certification, the director of the Ohio EPA is not bound by the regulations of the U. S. EPA or any other federal agency. To the extent that this particular question may raise federal issues, we agree with the finding of the Administrative Review Board and the Ohio Court of Appeals that the state certification under the Clean Water Act is set up as the exclusive prerogative of the state and is not to be reviewed by any agency of the federal government. 33 U.S.C. § 1371(c)(2). See *Mobil Oil Corp. v. Kelley*, 426 F.Supp. 230, 234–235 (E.D. Ala.1976). In all other respects we conclude that plaintiffs are barred from relitigating the validity of the 401 certification by the doctrine of res judicata.

Plaintiffs next argue that the Corps' issuance of permit No. 77–492–3 was unlawful because U. S. Steel did not obtain a 401 certification from the Commonwealth of Pennsylvania. It is their position that U. S. Steel is obligated to apply for and obtain a 401 certification from Pennsylvania as one of the states in which the discharge into the navigable waters of the United States will originate. This argument appears to be an afterthought since in the amended complaint plaintiffs argue only that Pennsylvania must be notified as a state whose water quality may be affected by the discharge in question and given 60 days to file objections or proposed permit conditions. The Clean Water Act requires that "any applicant for a Federal . . . permit to conduct any activi-

ty ... which may result in discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the state in which the discharge originates or will originate...." 33 U.S.C. § 1341.

█ Plaintiffs' first contention is that certain operations of the plant located in Pennsylvania will generate water pollutants which will end up in navigable waters of Pennsylvania and that discharge pipes will be located almost on the state line. Therefore, the plant discharge will originate in Pennsylvania where one-half the facilities are located and because the plant discharges will affect Pennsylvania waters, a Pennsylvania certification is required. This position has specifically been rejected by the U. S. EPA. In an opinion issued by the General Counsel, the agency stated that when a facility is located in one state and has the end of a discharge pipe within the waters of another state, the applicant must only get a 401 certification from the state in which the facility is located and *not* from the state where the discharge pipe is located. U. S. EPA, General Counsel Opinion (No. 78–8), *emphasis added.*

█ Plaintiffs next contend that the final EIS lists Raccoon Creek, a Pennsylvania stream, as one of the surface waters which will receive and discharge pollutants. Therefore, discharge will originate in Pennsylvania necessitating a 401 certification from that state. The final EIS, Vol. III, at pp. 4–643, does list Raccoon Creek as one of the surface waters which would be adversely affected during construction, but nowhere is it indicated that discharge would "originate" there. Origination of discharge is a touchstone requiring a 401 certification from a state and there is no evidence in the administrative record that any discharge will originate in Pennsylvania. Therefore, no such certification is required. Further, we note that the representatives of the Commonwealth of Pennsylvania and the Pennsylvania Department of Environmental Resources took part in the development of the final EIS and apparently agreed that there was no need for Pennsylvania to issue a 401 certification.

Plaintiffs' further complain that the defendants failed to comply with the referral procedures set forth in the Clean Water Act. 33 U.S.C. § 1341(a)(2). Section 401(a)(2) provides in pertinent part as follows:

> Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within 30 days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirement in such State, and within such sixty-day period notifies the Administrator ... or permitting agency in writing of its objection to the issuance of such license or permit and request a public hearing on such objection, the licensing or permitting agency shall hold such a hearing....

Defendants admit that the Corps did not formally notify the Administrator of the U.S. EPA of receipt of the purported 401 certificate from Ohio. Defendants contend, however, that only actual notice is required and that since two regional administrators of the U.S. EPA were members of the Technical Team and were kept informed of all relevant activities at every stage of the preparation of the EIS, the notice requirement was satisfied.

█ The purpose of the notice requirement is to enable a state whose water qualities may be affected by the proposed federal activity an opportunity to insure that its standards will be complied with. As defendants pointed out, the interagency Technical Team was represented by the Administrator of the U.S. EPA for Regions III

and V, Staff Director of the Federal Regional Council for the U.S. EPA for Region III, the Governor of Pennsylvania, representatives of the applicant and representatives of the Pennsylvania Department of Environmental Resources. The record is replete with references to the exchange of information between the federal and state representatives. Under the statute, if a state objects, it has the right to request *in writing* that a public hearing be held on its objections. There is nothing to indicate that such written objection was given, although it appears clear that Pennsylvania was aware of the proposed plan. In their brief, plaintiffs express concern that without receiving formal notice, the legal rights of the government and citizens of Pennsylvania, including the right to challenge the Administrator's decision not to refer the matter to Pennsylvania, would not be safeguarded. This concern is unwarranted. Maurice Goddard, Secretary of the Pennsylvania Department of Environmental Resources, indicates in a letter to Colonel Daniel Ludwig that: "Generally, the U.S.Steel proposals to protect water quality with regard to plant discharges are acceptable." EIS, Vol. IV, p. A–145. In addition, the compilation of letters and comments from individuals and groups in Pennsylvania illustrates convincingly that the legal rights of the Pennsylvania government and its citizens were adequately safeguarded.

### Inadequacies of the EIS

The next series of allegations involve shortcomings in the EIS itself. Plaintiffs allege that defendants failed to adequately consider the environmental impacts of a purportedly integral project by the Pittsburgh and Conneaut Dock Company ("P&C"), by failing to consider a treaty between the United States and Canada, by giving inadequate consideration to effects of the project on the wetlands. or to the effects of the culverting of Turkey Creek and by failing to supplement the EIS when conditions changed.

### Pittsburgh & Conneaut Dock Company

■ Plaintiffs suggest that the dredging activities and expansion of facilities by the P&C, a subsidiary of U.S.Steel located in the Conneaut harbor adjacent to the proposed lake front steel project, are an integral part of the proposed steelmill and the EIS should have considered in greater detail the environmental effects of such an expansion. U.S.Steel, P&C and the Corps have consistently stated that the present expansion of the raw material handling facility and concomitant dredging activities are not related to the lake front steel plant.

In response to a comment by the Conneaut Ad Hoc Committee, the Corps explained:

"The activity currently underway adjacent to the proposed steelmill site is totally independent of the proposed mill project and deals solely with expansion of a coal facility and water pollution control program of the Bessemer and Lake Erie Railroad and the Pittsburgh and Conneaut Dock Company. Coal facility expansion is a separate project designed to provide coal to power plants in Ontario. The above activity is neither related to the proposed Lakefront Plant nor applicable to the analysis of primary environmental impacts." EIS, Vol. 4, p. 9–52. *See also*, EIS, Vol. II, p. 2–539.

The EIS indicates that plans provide for the future expansion of P&C facilities to accommodate the raw materials requirement for the proposed steel project. EIS, Vol. I, p. 1–118.

The interrelation between the two projects concerning raw materials handling and storage was considered in the EIS generally in Volume I at pages 118 through 139 and more specifically as follows: concerning its effects on port traffic in the Conneaut Harbor at EIS, Vol. 2, pp. 2–530 through 2–540; concerning surface water runoff and waste water treatment at EIS, Vol. 3, pp. 4–768 through 4–770, and 4–941; and concerning airborne emissions relating to the handling and storage of raw materials at the P&C facilities at EIS, Vol. 1, p. 1–142.

The EIS supports the Corps' conclusion that expansion of the P&C to provide raw materials and storage services to the proposed lake front steelmill is likely, and to that extent any additional environmental consequences resulting from the two projects were taken into consideration before issuing a permit to U.S.Steel. This is all that is required under NEPA. Since it does not appear from the record that inadequate consideration was given to this matter, we find no reason to interfere in the discretionary duties of the Army Corps of Engineers.

### Great Lakes Water Quality Agreement of 1978

Plaintiffs seek summary judgment against the defendants for failure of the Corps to consider or give any weight to the requirements of the Great Lakes Water Quality Agreement of 1978. (App. to Plaintiffs' Brief, Vol. 1, at 180). The Great Lakes Water Quality Agreement of 1978 is an executive agreement signed by Cyrus R. Vance, Secretary of State, on behalf of the United States and by the Government of Canada to restore and maintain the chemical, physical and biological integrity of the Great Lakes Basin Eco System by prohibiting the discharge of toxic substances in toxic amounts. It provides that a plan for the virtual elimination of discharges of persistent toxic substances into the Great Lakes System must be completed and in operation not later than December 31, 1983.

NEPA requires that all agencies of the federal government shall "recognize the worldwide and longrange character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment." 42 U.S.C. § 4332(2)(F). The regulations of the Corps also indicate that international impacts and factors should be discussed in the EIS. 33 C.F.R. § 209.410(i)(6)(ii).

Defendants view the Great Lakes Water Quality Agreement as an executive one, requiring Congressional action to authorize funds implementing its programs. They interpret its general objectives of "eliminating or reducing to the maximum extent practicable the discharge of pollutants" to be bounded by "practicability" as suggested in the specific objectives of the Agreement. The defendants contend that the Corps fully considered the predecessor 1972 Agreement in the draft EIS and the substantially identical 1978 Agreement in the final EIS. Defendants also argue that the Corps permit only covers construction of water intake and discharge systems and other activities *preliminary* to the construction of the proposed mills and that the effluent discharges may be permitted only by the U.S. EPA or the state during the NPDES permit process.

Since plaintiffs are not attempting to enforce the terms of the Agreement, it is not necessary to interpret its language. The plaintiffs only have standing to complain that defendants violated NEPA by failing to consider the Agreement during its decision making process. A memorandum from general counsel to the U.S. EPA indicates that "[a]lthough the agreement does not override federal law and is not legally binding within U.S. boundaries, it does represent a commitment of the U.S. to fulfill its terms. Consequently, the Agreement must be considered in formulating federal policies and in making responsible decisions within the federal government." Annex to Government Consolidated Reply Brief, p. 96.

The 1978 Agreement was discussed briefly in the final EIS. In a response to comments received during the review process of the draft EIS the Corps stated:

[t]he comments correctly state that the new 1978 Agreement places strong focus on cooperative and individual efforts to control the discharges of 'toxic substances' and other pollutants to the Great Lakes. One portion of the Agreement (Annex 10) requires that the parties maintain a list of pollutants known or

suspected to have adverse affects on the lake's biota and a risk of being discharged. The parties further have agreed to: 'develop and implement programs and measures to minimize or eliminate the risk of release of hazardous polluting substances to the Great Lakes System'.

The draft statement did include several sections (4–503 to 4–516) which discussed in depth the chemicals that were expected to be in the proposed plant's discharge. A refined list could only be prepared from analyses of the actual effluent once the plant is in operation. By that time it is possible that the parties will have developed specific regulations—relating to the 'programs and measures' referred to above which could require some action on the part of the applicant.

The 1978 Agreement (in Annex I) also formally adopted specific objectives for numerous chemical, physical, microbiological, and radiological parameters or pollutants. These recent objectives are, with two exceptions, the same as those listed in Table 2–338 of the draft statement which is a comparison of water quality criteria for Lake Erie relative to substances proposed for Lakefront Plant discharge. The two exceptions are: cadmium, for which the objective is 0.0002 mg/1 and phenols, for which the objective is 0.001 mg/1. Except for the cadmium objective, these IJC objectives differ little or not at all from legally enforceable water quality standards currently in effect in the State of Ohio. Ohio's standard for cadmium is 0.0012 mg/1. It should be noted the current levels of cadmium in Lake Erie waters near the project site are typically about 0.001 mg/1 with some values up to 0.005 mg/1, as indicated in Tables 4–286 and 4–287 of the Draft EIS. Additionally, the analysis of known effects of cadmium on aquatic life as presented in Chapter Four of the Draft EIS concluded that 'predicted con-

centration of cadmium, even in the effluent itself, are generally below the reported effects levels . . .' EIS, Vol. IV, p. 9–116

This response indicates that the Corps did review the terms of the Agreement and take them into consideration in preparing the draft and final impact statements. NEPA does not specify how much weight should be given to such international factors, requiring only that the agency "recognize" and "lend appropriate support" to programs designed to prevent a decline in the quality of world environment. 42 U.S.C. § 4332(2)(F). The final EIS indicates compliance with this section of NEPA.

### Wetlands

Plaintiffs submit that the Corps' analysis of the wetland communities in the EIS is grossly inadequate and misleading. They argue that the Corps' own regulations, as well as guidelines of the U.S. EPA, require careful consideration be given to preserving wetlands and that the EIS indicates that the only consideration given was cursory and insufficient to enable Colonel Ludwig to make a knowledgeable decision on this important environmental resource.

On the contrary, the EIS devotes considerable attention to the wetlands, swamps, marshes, bogs and similar areas saturated by water. The EIS describes the areas geographically, biologically, ecologically and other ways the court has never heard of before.[1] See EIS, Vol. II, pp. 2–987, 2–995, 2–996, 2–1028 through 2–1033; Vol. III, pp. 4–808, 4–818, 4–845; Vol. IV, pp. 5–35, 5–36. There is more than adequate information included in the EIS to enable Colonel Ludwig to take the wetlands into consideration in reaching his decision. Once again, it appears that the plaintiffs are unhappy with the final decision rather than the procedural manner in which it was reached.

1. The court is not unfamiliar with the area, having spent time in the Summers of his boyhood at a Boy Scout Camp in the immediate vicinity of the proposed plant, and having spent a lifetime in the county of Pennsylvania where the plant is to be located, paying some particular attention to the activities of the aquatic life off shore.

*Culverting of Turkey Creek*

Count One of the amended complaint alleges that the Corps significantly changed the project between the publication of the draft EIS and the final EIS by deciding to culvert rather than divert Turkey Creek without amending the draft EIS and circulating it to the governmental agencies and the public for comment as required by NEPA. Count Six charges additional violations of Sections 401 and 404 of the Clean Water Act and violations of the Civil Rights Act, 42 U.S.C. Section 1983, in connection with the culverting of Turkey Creek. The complaint alleges that this is subject to the common law and statutory rights of the plaintiffs to use and have access to Turkey Creek as a navigable stream. In their brief and reply brief, plaintiffs argue only the former point and appear to have abandoned their position that Turkey Creek is a navigable stream.

Plaintiffs urge us to order defendants to amend the draft EIS and allow for public comment on the culverting of Turkey Creek according to the procedure required in the Corps' regulations. The regulations are drafted to insure that environmental information is made available to citizens before decisions are made and to encourage public involvement in agency decisions. 40 C.F.R. § 1500(b); 1500.2(b) and (d). More specific regulations concerning the inviting of public comments provide as follows:

Section 1503.1 Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement, the agency shall: ...

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under Section 1506.10. 40 C.F.R. § 1503.-1.

Plaintiffs concede that they were aware that the culverting of Turkey Creek was mentioned as a possibility a number of times in area newspapers from October, 1978, through February of 1979. However, they argue that the public was not made aware that U.S.Steel had definitely decided to abandon the diverting options until the final EIS was issued and therefore the Corps did not insure the fullest public participation at the earliest time as required by the regulations.

■ The regulations are not specific as to what kind of notice is required, but their purpose is to invite public comment prior to the final decision. Plaintiffs' briefs and appendices in support thereof indicate that the plaintiffs had an opportunity to comment on the plans for Turkey Creek as laid out in the final EIS prior to the final decision by the Corps of Engineers. Even if the Corps did, as plaintiffs contend, "frustrate the purpose and letters" of the regulations, plaintiffs, and others, corrected any frustration by offering their views to Colonel Ludwig on the propriety of culverting Turkey Creek *prior* to his final decision. Nothing would be accomplished by ordering a rewrite of the voluminous draft and final impact statements just so defendants could have the benefits of plaintiffs' views once again.

Nor is it necessary for the Corps of Engineers to supplement the draft EIS due to changes in the project. The Corps is under a continuing duty to gather and evaluate new information relative to the environmental impact of its actions. 42 U.S.C. § 4332(2)(A), (B). Regulations require supplements to be prepared if "the agency makes substantial changes in the proposed action," or if "significant new circumstances or information" bearing on the environment surface. 40 C.F.R. § 1502.9(c). The decision of the agency not to supplement an EIS will be upheld if it is reasonable. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980).

There is no indication that the defendants' decision to abandon its diverting op-

tions as suggested in the draft EIS and choose the culverting option in the final EIS was based on inaccurate or insufficient environmental information. In fact, defendants contend that the culverting of Turkey Creek will actually lessen the severity of adverse impacts on the environment and plaintiffs do not refute this. In addition, plaintiffs concede that this possibility had been discussed initially and debated continually throughout the process of compiling both impact statements. Based on this, there is nothing to indicate that the position taken in the final EIS was such a "substantial change" based on "significant new circumstances or information" as to require an amended draft EIS. Nor does it appear that the defendants' decision not to supplement the statement was unreasonable.

### Fish and Wildlife Coordination Act and the Migratory Bird Act

Count Five of the complaint alleges that the defendants drew up the draft and final impact statements and issued the permit to U.S.Steel in violation of the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. § 661, *et seq.*, the Migratory Bird Act, 16 U.S.C. § 701, *et seq.* and the Corps' regulations. The Fish and Wildlife Coordination Act is intended to encourage cooperation between the Secretary of the Interior and other federal, state and public or private agencies in conserving wildlife resources while expanding the national economy. 16 U.S.C. § 661. The Act requires that:

(a) ... [w]henever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, ... by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particu-

lar State wherein the impoundment, diversion, or other control facility is to be constructed with a view to the conservation of wildlife resources and preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development. (b) ... In furtherance of such purposes, the reports and recommendations of the Secretary of the Interior on the wildlife aspects of such projects ... shall be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects when such reports are presented to the Congress or to any agency or person having the authority ... to authorize the construction of water-resource, development projects.... The reporting officers in project reports of the Federal agencies shall give full consideration to the report and recommendations of the Secretary of the Interior and to any report of the State agency on the wildlife aspects of such projects, and the project plan shall include such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits. 16 U.S.C. § 662.

The Corps' regulations reiterate the requirement that they consult with the Regional Director, U.S. Fish and Wildlife Service and the head of the state agency responsible for fish and wildlife and give great weight to their views in evaluating the application. The regulations provide that the applicant will be urged to modify his proposal to eliminate or mitigate any damage to such resources, and in appropriate cases a permit may be conditioned to accomplish this purpose. 33 C.F.R. § 320.-4(c).

Plaintiffs argue that this Act was violated because defendants ignored State and Federal agency requests that the final EIS definitively display in maps the areas of the plant site which will remain completely undeveloped. The fact that the defendants

issued the permit and refused to withdraw it despite the recommendations of the U.S. Fish and Wildlife Service and the Pennsylvania Agencies is a violation of the Fish and Wildlife Coordination Act according to the plaintiffs. Plaintiffs do not consider this issue proper for summary judgment since there is a dispute as to whether the U.S. Fish and Wildlife Service supported the wildlife management plan developed by a private consulting firm. This dispute is not critical to the question of whether the defendants consulted with the Secretary of the U.S. Fish and Wildlife Service, with the head of the appropriate state agencies, made their reports an integral part of the Corps report, and gave their reports and recommendations full consideration as required by the Act.

▆▆▆▆ The EIS indicates that the statutory and regulatory procedures were followed. There is no requirement that the Corps follow the advice of the State or Federal agencies or adopt their positions. Plaintiffs are arguing that the final decision was wrong because a Pennsylvania agency recommended against it. Review of the merits of the agency's proposed action is not required by NEPA. One circuit court has stated that "[t]he project, when finished, may be a complete blunder—NEPA insists that it be a knowledgeable blunder." *Matsumato v. Brinegar, supra.*

The administrative record and the final EIS support defendants positions that they did not violate either the Fish and Wildlife Coordination Act or the Migratory Bird Act. See, Administrative Record, Vols. 1, 2 and 3; EIS, Vol. II, pp. 2–991 through 2–1071; EIS, Vol. III, pp. 4–838, 5–61, and 6–120 through 6–129. Representatives of federal and state fish and wildlife organizations were consulted early in the review process and contacts were maintained throughout the permitting process. The end result of all these consultations was the development of the fish and wildlife management plan for the lakefront site by the consulting firm of Fahringer, McCarty, Grey, Inc. Administrative Record, Vol. 113. The U.S. Fish and Wildlife Service and the Ohio Department of Natural Resources wholly supported the Wildlife Management Plan developed by Fahringer, McCarty & Grey, Inc. All fish and wildlife resource agencies except the Pennsylvania Fish and Game Commissions agreed that the effect of culverting Turkey Creek culvert upon fish and wildlife would be minimal.

The fact that the Pennsylvania Game and Fish Commission opposed issuance of the permit does not mean that the Corps did not give "full consideration" or "great weight" to the views of that agency. It only shows that they gave greater weight to the views of the majority of the agencies and experts which studied the effects the plant would have on wildlife.

## CONCLUSION

Plaintiffs have persistently and diligently attacked the final environmental impact statement from every conceivable angle. Defendants have steadfastly stood behind their decision to issue the permit and support their motion for summary judgment with the four corners of the impact statement and the administrative record. In an effort to comply with the applicable standards of review, the court has conducted a thorough and in-depth review of the record to determine whether the agency action is in accord with NEPA and the APA. While we have been impressed with the conscientious efforts of plaintiffs to ferret out every possible procedural deficiency during this two-year process, we have been even more impressed with the good faith efforts of the Army Corps of Engineers.

In order to successfully oppose the defendants' motion for summary judgment, plaintiffs must "set forth specific facts showing that there is a genuine issue for trial." *Tunnell v. Wiley*, 514 F.2d 971 (3d Cir. 1975). Despite protestations from the plaintiffs, our studies indicate that the instant case is not one which presents conflicting factual instances of a material nature, nor is it a case where credibility is an important factor. In addition, our review focused on the administrative action as documented prior to the start of this litigation

since de novo review is not proper in a NEPA case. Therefore, this is the type of case in which the summary judgment procedure has a special utility. *Upper West Fork River Water Shed v. Army Corps of Engineers*, 414 F.Supp. 908, (N.D.W.Va. 1976), *aff'd* 556 F.2d 576 (4th Cir. 1977), *cert. denied* 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752. Keeping in mind that any doubt must be resolved against the moving party, plaintiffs' materials and general assertions when applied with the gravamen of the complaint, do not show sufficient facts to establish that there are genuine issues for trial. Consequently, a trial in this case would be a useless formality since there has been no showing that any different or additional evidence would be adduced. *See Lundeen v. Cordner*, 354 F.2d 401 (8th Cir. 1966). *Sims v. Mack Truck Corp.*, 488 F.Supp. 592 (E.D.Pa.1980). Therefore, for reasons previously given, defendants' motion for summary judgment will be granted and plaintiffs' motions for partial summary judgment will be denied.

An appropriate order will be entered.