The CLAIRTON SPORTSMEN'S CLUB, a Pennsylvania corporation, Christopher A. Smith, an individual, 31st Ward Citizens Council, Inc., a Pennsylvania non-profit corporation, Mount Washington Community Development Corporation, a Pennsylvania non-profit corporation, Pasquale A. Capolupo, an individual, Richard Clark, an individual, Jefferson United Association, an unincorporated association, Plaintiffs,

v.

PENNSYLVANIA TURNPIKE COMMISSION, Pennsylvania Department of Transportation and the Federal Highway Administration, Defendants,

and

Mon Valley/Fayette Expressway Association, an unincorporated association, Mon Valley Progress Council, Inc., a Pennsylvania non-profit corporation, Greater Charleroi Industrial Development Corporation, a Pennsylvania non-profit corporation, Middle Monongahela Industrial Development Association, Inc., a Pennsylvania non-profit corporation, Washington County Council on Economic Development, a Pennsylvania non-profit corporation, Monongahela Rotary Club, a Pennsylvania non-profit corporation, Monongahela Area Chamber of Commerce, an unincorporated association, Monessen Chamber of Commerce, a Pennsylvania non-profit corporation, California Chamber of Commerce, a Pennsylvania non-profit corporation, County of Washington, a political subdivision, City of Monongahela, a political subdivision, Township of Carroll, a political subdivision, Township of Fallowfield, a political subdivision, Borough of California, a political subdivision, Borough of Charleroi, a political subdivision, Borough of Donora, a political subdivision, Borough of Elco, a political subdivision, Borough of North Belle Vernon, a political subdivision, Borough of Stockdale, a political subdivision, Irey Construction, Inc., a Pennsylvania corporation, Jaycee Foods, Inc., a Pennsylvania corporation, Rischitelli Trucking, Inc., a Pennsylvania corporation, Corning Consumer Products, Inc., a New York corporation, Lee Supply Co., Inc., a Pennsylvania corporation, and Peter J. Daley, an individual, Intervenor–Defendants,

and

Fayette County Expressway Completion Organization, Amicus Curiae.

Civ. A. No. 94–1114.

United States District Court, W.D. Pennsylvania.

April 3, 1995.

Anthony P. Picadio, Picadio, McCall, Kane & Norton, Pittsburgh, PA, for plaintiffs.

Charles B. Gibbons, Michael J. Manzo, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for Pennsylvania Turnpike Com'n.

Robert J. Shea, John M. Hrubovcak, Harrisburg, PA, for Pennsylvania Dept. of Transp.

Michael C. Colville, U.S. Atty's. Office, Pittsburgh, PA, for Federal Highway Admin.

John M. Purcell, Davis & Davis, Uniontown, PA, for amicus curiae Fayette County Expressway Completion Organization.

Steve M. Nolan, Mollica Murray & Hogue, Pittsburgh, PA, for intervenor-defendants.

## OPINION

CINDRICH, District Judge.

This is an action for review of a decision to build a seventeen mile, $413 million limited access highway, from Interstate 70 to Route 51 near Large, Pennsylvania, a point short of the major metropolitan area in the region. The immediate issues raised by this decision concern vehicle traffic. Barely below the surface and directly connected to the traffic issues, however, are matters of economics, land development, employment, politics, regional influence, ecology, and sociology.

The parties and intervenors address both the traffic and non-traffic issues at length in their briefs. This is to be expected given their importance and the anticipated direct relationship between the highway and the fortunes of surrounding communities. Indeed, the obvious and intrinsic importance of these issues may make it difficult to accept that a court cannot influence related decision-making, and can exercise authority over such cases only under fairly narrow conditions. It is not that the Court considers these issues any less important. Rather, the law firmly recognizes that the elements that make up such decisionmaking are so diverse that they are consigned to officials and agencies with specialized knowledge, experience, resources, and mechanisms for broad public participation that a court does not possess. Thus, while a host of issues must be considered by the defendants ("Agencies") in deciding what form their transportation objectives will take, we review the Agencies' actions only to ensure that such issues are genuinely considered. We are not free to weigh the many competing interests underlying these issues. Having reviewed the Agencies' consideration of the issues in detail we conclude that their actions were consistent with governing law. Accordingly, plaintiffs' challenge to the Agencies' actions will be denied.

## FACTUAL BACKGROUND

What is now known as the Mon/Fayette Transportation Project is a series of roads and prospective roads extending 65 miles from I–68 near Morgantown, West Virginia to the City of Pittsburgh. Southern portions of this project have been completed and are open for traffic. At issue here is the construction of the northern portion. ARBD 27 PO–2 to PO–3.[1]

At one time the northern portion was conceived of as a single road extending from I–70 to I–376, to be built in a single stage. In its present form in this litigation, this portion of the project has been divided. The roadway is now planned to span seventeen miles from I–70 near Speers, Pennsylvania to Route 51 near Large, Pennsylvania; it does not extend to I–376 or the City of Pittsburgh. It will lie west of the Monongahela River, in rough proximity to Mid–Mon Valley[2] communities such as Donora, Charleroi, Monessen, and Monongahela. It will be a four lane, limited access toll road with interchanges near Charleroi, Monongahela, and Finleyville. It will be constructed by the Pennsylvania Turnpike Commission ("Commission") and become part of the Pennsylvania Turnpike System. ARBD 27 at II–36 to II–43.

Plans for construction of a north-south highway serving the Mid–Mon Valley have existed for twenty-five years. ARBD 1 at 5. Lack of funding habitually prevented the highway from being built. The advent of toll revenues as a source of financing brought the

---

1. The administrative record filed by the parties is identified by the abbreviations ARBD and AR. Each volume of the administrative record is numbered. Court citations to the administrative record are to the volume and page within.

 References to documents in the Clerk's docket file are by document number ("Doc. No.").

A glossary of abbreviations and acronyms is attached for the convenience of the reader.

2. According to the intervenors, who hail from the area, the Mid–Mon Valley is the area along the Monongahela River below the Allegheny County line to Brownsville in Fayette County. Interv. Br. at 5.

project back to life in the mid–1980's. In 1985, the Pennsylvania legislature authorized the Commission to build, among other projects, a road from I–70 to I–376 that was permitted to become a toll road. 75 Pa.Cons. Stat.Ann. § 8912(1). The toll feature allowed then Governor Casey to propose the project for federal funding under the Surface Transportation and Relocation Assistance Act. That Act permitted federal funding of up to 35% of toll road projects, reversing the federal government's previous policy of funding only toll-free highways. 23 U.S.C. § 129(a) and (j). *See* ARBD 27 at ES–1.

With federal funding in place, construction planning proceeded. Until June 1992, studies of the northern portion of the Mon/Fayette Transportation Project were based on a road that stretched from I–70 to I–376. *See* ARBD 1 at 7; ARBD 3 at 1–6; ARBD 35 at 167.[3] For example, an engineering study for the Commission issued in March 1992 evaluated the road from I–70 to I–376. ARBD 3. There is no question that the proposed transportation project was to be linked to the major metropolitan areas of Morgantown and Pittsburgh. *See, e.g.,* ARBD 35 at 9. There likewise is no question that the entire Mon/Fayette Project, while ultimately intended to encompass a continuous road surface, was being planned and built in different stages at different times. *See, e.g.,* ARBD 27 at PO–2; ARBD 1 at 7; ARBD 3 at 1–2; ARBD 35 at 177.

On June 29 and 30, 1992, more than sixty federal, state, and local officials participated in a conference[4] to re-evaluate the transportation needs of the Morgantown–Pittsburgh corridor. The conferees concluded that:

> reconsidering different project needs in the corridor from Pittsburgh, Pennsylvania to Morgantown, West Virginia showed differing needs for different sections, depending upon: variations in the surrounding areas; existing highway conditions; pro-

jections of future traffic demands; and known community and environmental constraints.

> In order to design improvements to best meet these varying needs most effectively, the overall transportation improvements for the corridor were designated as individual projects, with individually determined alternatives and individually tailored environmental studies.

ARBD 27 at PO–5. Project construction and the accompanying environmental impact studies thus were to be divided into four geographical areas:

(1) I–68 to Uniontown, Pennsylvania;

(2) Uniontown to I–70;

(3) I–70 to Route 51; and

(4) Route 51 to Pittsburgh.

The Agencies outlined the perceived benefits to this approach, namely: greater responsiveness to local needs; independent scheduling of environmental review; and precision that is lost when impacts are assessed in project areas that are too large. ARBD 27 at PO–5.

Following the June 1992 conference the FHWA requested the EPA and the Army Corps of Engineers to become cooperating agencies in developing environmental impact statements ("EIS"). These agencies and others participated in regular coordination meetings to continue review of the project goals, suggest alternatives, and resolve problems related to the project. ARBD 27 at PO–12.

A Draft Environmental Impact Statement ("DEIS") was circulated in March 1993, and a public hearing held in May 1993. A Supplemental DEIS was issued in September 1993 to address an alternative route known as the Green Alignment running through Jefferson Borough, Allegheny County. ARBD 21 at 1. Another public hearing was held in

---

3. Note that ARBD 35, the Mon Valley/Fayette Expressway Needs Document (Sept. 21, 1990), over an inch thick, has no page numbers. We have tabbed the pages we cite.

4. The conference was attended by representatives of, among other agencies, the Federal Highway Administration ("FHWA"), the U.S. Environmental Protection Agency ("EPA"), the Army

Corps of Engineers, the Commission, PennDOT, the Pennsylvania Department of Environmental Resources, the Southwestern Pennsylvania Regional Planning Commission, the Allegheny, Fayette, and Washington County Planning Commissions, and the City of Pittsburgh Department of Planning.

October 1993 to provide and receive additional information about the project.

Based on the DEIS, Supplemental DEIS, agency comments and public comments, a two-volume Final Environmental Impact Statement ("FEIS") was prepared. ARBD 27 and 28. The FEIS identified the needs of the Mon Valley and the purposes of transportation improvements for that area:

—existing poor roadway conditions impede efficient movement of goods and services throughout the area;

—roadway capacity is insufficient to relieve existing and future congestion;

—vehicular and pedestrian safety needs to be improved;

—roadway linkage between major highways serving the area is insufficient;

—accessibility to social services and accessibility by emergency services in the area needs to be improved;

—transportation services capable of supporting economic redevelopment of the area are not present.

ARBD 27 at ES–2. The FEIS reviewed four alternatives for the I–70 to Route 51 project that would serve these objectives. A transportation system management alternative would make improvements to the existing road system and implement changes that would not require construction, such as additional bus service and staggered travel times. The upgrade of existing highways alternative would make substantial construction improvements to Routes 837 and 88 that now serve the area. The no-build alternative consists of only routine improvements. The new alignment alternative consists of the limited access, four lane toll road from I–70 to Route 51. ARBD 27 at ES–2 to ES–3.

The FHWA approved the FEIS on February 23, 1994. Notice of the availability of the FEIS was published in the Federal Register on March 4, 1994. A public hearing on the FEIS was conducted on March 16, 1994. The EPA, Army Corps of Engineers, and three state agencies had no objections to the FEIS. ARBD 32 at 5. After reviewing the environmental documents and comments, the FHWA issued a Record of Decision on May 19, 1994, selecting the new highway alterna-

tive. ARBD 32. This constitutes the FHWA's final agency decision. The alternative selected includes a stretch known as the Green Alignment which, though not agreeable to all residents affected, was suggested by a group of residents of Jefferson Borough. ARBD 32 at 6.

Before and after the June 1992 conference, the United States Fish and Wildlife Service, Department of the Interior, recommended that the cumulative effects of the entire Morgantown–Pittsburgh corridor be studied. The Commission thereafter formed a Cumulative Project Impacts Subcommittee to gather information consistent with its title. The Subcommittee met five times from June 1993 to December 1993, and had begun considering a model by which to analyze the cumulative effects of the entire project. *See, e.g.,* ARBD 27 at PO–11; Doc. No. 29. Its work ended, however, when the FEIS was issued in February 1994.

We believe this to be a sufficient factual account to preliminarily inform the analysis that follows. Rather than include more of the extensive factual history here, we prefer to cite additional facts as necessary below in our analysis.

### PROCEDURAL BACKGROUND

Plaintiffs filed their complaint on July 6, 1994. At a hearing before Judge Ambrose on August 22, 1994, the Court considered the status of the case and the parties agreed to submit an administrative record for review, which they have done. This record consists of 70 volumes (including two supplements, filed separately by plaintiffs and defendants), totalling approximately ten linear feet of documents.

Plaintiffs moved for final injunctive relief on October 3, 1995. Defendants moved for summary judgment on October 20, 1994. After the case was reassigned, we held a status conference on December 1, 1994. We then heard oral argument on the pending motions on January 26, 1995.

A large group of organizations and individuals were granted permission to intervene on September 1, 1994. They include nine public and private economic development or busi-

ness associations, ten political subdivisions, five businesses, and a state legislator. Five other state legislators and a federal congressman were permitted to join the intervenors on February 1, 1995. The intervenors support construction of the road in its current form. They have submitted briefs and made arguments advancing their position.

A state legislator was allowed to intervene on plaintiffs' behalf on February 1 as well.

In challenging the Agencies' decision to divide the project north of I–70 into two segments, plaintiffs invoke the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., the Intermodal Surface Transportation Efficiency Act ("ISTEA"), 23 U.S.C. § 134, and federal regulations associated with each. Plaintiffs allege, among other things, that political pressure, and not practicality, compelled the participants at that time to divide the northern portion of the Project in two (I–70 to Route 51 and Route 51 to Pittsburgh), and to accelerate planning and construction of the southern of these two sections.

Plaintiffs' application to the Court for final judgment in its favor takes the form of a Request for Final Injunctive Relief. Doc. No. 27. Defendants have moved for summary judgment. Doc. No. 30.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We find no genuine disputes of material fact, principally because this is an administrative record review case. *See Lake Erie Alliance v. Army Corps of Engineers*, 526 F.Supp. 1063, 1068 (W.D.Pa.1981). Instead, the disputes lie in the legal issues of whether and to what extent the Agencies complied with the procedural requirements of NEPA and ISTEA.

### GENERAL SCOPE OF REVIEW

Plaintiffs' entitlement to pursue this case, and our authority to review the federal administrative action taken, arise out of provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706.[5] The APA roots of this method of analysis are worth noting for several reasons. First, a fair number of relevant NEPA cases do not mention the APA, though they cite controlling terms, such as the arbitrary and capricious standard of review of agency action, taken from the statute. Second, the parties have only modestly considered the APA in seeking final judgment.[6] Finally, resort to APA principles applied to other forms of agency decisionmaking may resolve ambiguities or fill gaps left by decisions involving NEPA, for example, by helping define the scope of the record properly subject to review, or by controlling our interpretation of ISTEA, which few courts have reviewed.

In applying the APA, the agency's decision "is entitled to a presumption of regularity.... But that presumption does not shield [agency] action from a thorough, probing, indepth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91

---

**5.** The judicial review section of the APA provides in part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

　　(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
　　(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

　　(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;
. . .
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706.

**6.** Plaintiffs cite the "general judicial review standards" of the APA in passing on page 42 of their brief in support of final injunctive relief. Defendants do not cite the APA in their 89 page summary judgment brief, though they do so in their reply brief.

S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The remedy available were we to find a violation of NEPA or ISTEA is narrow. "[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such inquiry." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).

■ A manifestation of this principle is the deference we must accord executive agency decisions.

> [The] view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, we need not find that it is the only permissible construction that [the agency] might have adopted but only that [the agency's] understanding of this very "complex statute" is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency].

*Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985). *Accord Matter of Seidman,* 37 F.3d 911, 924 (3d Cir.1994); *EEOC v. City of Mt. Lebanon,* 842 F.2d 1480, 1492 (3d Cir.1988) (agency's interpretation "especially important" where specialization is significant factor supporting agency action); *National Ass'n of Metal Finishers v. EPA,* 719 F.2d 624, 637 (3d Cir.1983) ("[i]f an act is susceptible to more than one reasonable interpretation, we must accept any reasonable interpretation chosen by the agency"), *rev'd on other grounds,* 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); *Budd Co. v. Occupat'l Safety and Health Review Commission,* 513 F.2d 201, 204 (3d Cir.1975) (courts obliged to accord "great deference" to agency interpretation of statutes committed to it for implementation).[7]

## THE SCOPE OF THE RECORD

■ Review of agency decisions under the APA is based on "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. This provision refers to the administrative record before the agency at the time the decision was made. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 421, 91 S.Ct. 814, 826, 28 L.Ed.2d 136 (1971).

> "[T]he focal point for judicial review [of agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973). The task of the reviewing court is to apply the appropriate APA standard of review, 5 USC § 706, to the agency decision based on the record the agency presents to the reviewing court.

*Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). This standard applies to review of agency decisions under NEPA. *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988).

■ Plaintiffs dispute the Agencies' reliance on a February 18, 1994 letter from the EPA's acting regional administrator to Davitt Woodwell, a staff attorney for the Pennsylvania Environmental Council. Doc. No. 28. Plaintiffs assert that the letter should be excluded from the administrative record because it was not considered by the defendants in their decisionmaking. They cite no authority defining the scope of the record. Instead, they cite twenty-one cases containing language criticizing the EPA. Pls' Reply Br. at 7–9, Doc. No. 37. The Agencies respond that the EPA participated in the NEPA process, and regularly expressed its policy views and specific conclusions regarding the Mon Valley/Fayette Transportation Project. They argue that this letter essen-

---

7. The Third Circuit has found the principle of according deference to agency interpretations of statutes misapplied under certain circumstances. For example, deference is not justified when the agency's interpretation is inconsistent with the statutory mandate, *Dept. of the Navy v. FLRA,* 840 F.2d 1131, 1134 (3d Cir.1988), *cert. dismissed,* 488 U.S. 881, 109 S.Ct. 632, 102 L.Ed.2d 170 (3d Cir.1988); when the agency interprets a general statute, *id.;* when the agency has no special expertise in the area, *id.;* or when the agency interprets another agency's statute or resolves a conflict between its own statute and that of another agency, *Dept of the Navy v. FLRA,* 836 F.2d 1409, 1410 (3d Cir.1988).

tially repeats EPA positions expressed elsewhere in the administrative record, and so should not be excluded.

The EPA letter predates the FHWA's May 19, 1994 Record of Decision, the final agency action. The EPA was directly involved with the Project as a cooperating agency on the FEIS. The Pennsylvania Environmental Council commented on the Project. In fact, the FEIS contains twenty-eight pages of comments by Mr. Woodwell himself on the DEIS and Supplemental DEIS. ARBD 28 at VIII–219 to VIII–232.

■ A document need not literally pass before the eyes of the final agency decision-maker to be considered part of the administrative record. We find no distinction between the EPA letter in question, for example, and the comprehensive Agency responses to commentators contained in section VIII of the FEIS. ARBD 28. Given the identities of the author and the recipient and the subject matter of the letter, we find the February 18, 1994 EPA letter properly part of the administrative record, although we do not view its inclusion as in any way affecting the outcome of this case.

With the exception of plaintiffs' objection to this letter, the scope of the administrative record has not been a point of contention among the parties in seeking final judgment. We address one other matter regarding the scope of the record as a housekeeping measure, and for the possible benefit of a reviewing court. The parties have filed supplements to the administrative record. Doc. Nos. 29, 32. The intervenors have filed a "List of Supplemental Exhibits." Doc. No. 33. Without making document-by-document findings, it appears that plaintiffs' and defendants' submissions are part of the administrative record because of the topics, agencies, and persons mentioned therein. We cannot say the same for the intervenors' exhibits and we have not accepted them as properly a part of the administrative record.

## DISCUSSION

Plaintiffs argue that, under NEPA, the Agencies are required to consider the cumulative impacts of both the I–70 to Route 51 road and the Route 51 to Pittsburgh project in a single EIS. They also contend that NEPA requires the Agencies to consider the upgrade of Route 51 South as an alternative. Under ISTEA, they allege that the Agencies improperly denied public participation in the production of two studies compelled by regulations under the statute. They also dispute the FHWA's decision to dispense with one of the studies as a separate document, and they challenge the fundamental reliability of the other.

### I. NEPA

#### A. The Statute and Associated Scope of Review

■ NEPA imposes duties upon agencies that are essentially procedural. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). In what the Third Circuit describes as the "heart and soul" of the statute, *Morris County Trust for Historic Preserv'n v. Pierce,* 714 F.2d 271, 275 (3d Cir.1983), NEPA requires federal agencies to prepare "a detailed statement by the responsible official" for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This is the environmental impact statement. The EIS must consider:

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

NEPA "requires a balancing between environmental costs and economic and technical benefits." *Cape May Greene, Inc. v. War-*

*ren,* 698 F.2d 179, 188 (3d Cir.1983). It does not require agencies to "elevate environmental concerns over other appropriate considerations." *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam).

Under NEPA, the Third Circuit has determined that agency action in developing EIS's must be upheld unless the agency "failed adequately to follow prescribed procedures or made decisions that were 'arbitrary, capricious, and an abuse of discretion.'" *Township of Springfield v. Lewis,* 702 F.2d 426, 442 (3d Cir.1983), quoting *Concord Township v. United States,* 625 F.2d 1068, 1073 (3d Cir.1980). We adhere to this standard in our analysis.[8]

In a recent decision involving a NEPA challenge, among others, to a highway construction project, the First Circuit similarly found that "[t]he actions of [federal] agencies shall not be overturned unless 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Conservation Law Found'n v. Federal Highway Admin'n,* 24 F.3d 1465, 1471 (1st Cir.1994), quoting 5 U.S.C. § 706(2)(A). The court went on to identify the "highly deferential abuse of discretion standard of review" applicable to NEPA cases. *Id.* at 1471. The Ninth Circuit directly applies the "without observance of procedure required by law" standard of the APA when the question is whether the EIS was adequate. 5 U.S.C. § 706(2)(D); *Coalition for Canyon Preserv'n v. Bowers,* 632 F.2d 774, 781 (9th Cir.1980).

"[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay,* 444 U.S. at 227–28, 100 S.Ct. at 500, citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) (internal citation omitted). "The NEPA process involves an al-

most endless series of judgment calls.... It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Coalition on Sensible Transport'n, Inc. v. Dole,* 826 F.2d 60, 66 (D.C.Cir.1987). "As long as the 'statutory minima' is satisfied, NEPA requires only that the agency take a 'hard look' with 'good faith objectivity' at the environmental consequences of a particular action." *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 436 (5th Cir.1981) (citation omitted).

Plaintiffs also rely on two regulations which figure directly in our NEPA analysis. The FHWA regulation at 23 C.F.R. § 771.111(f) (1993) helps insure that every highway project serves a useful purpose, though not necessarily the ideal purpose. The Council on Environmental Quality ("CEQ") regulation at 40 C.F.R. § 1508.25 (1993) helps insure that decisionmakers consider related past, present, and pending agency action in identifying the most complete picture of environmental effects associated with a particular project or group of projects.

### B. *Whether the Route 51 to Pittsburgh Project is Cognizable under NEPA*

Plaintiffs' first challenge to the Agencies' actions is that the FEIS violates NEPA and applicable federal regulations because it fails adequately to consider the environmental impacts of the project from Route 51 to Pittsburgh. This claim rests on the assertion that the two projects—I–70 to Route 51 and Route 51 to Pittsburgh—both currently fall within the scope of NEPA. Excluding from the FEIS a detailed look at the Route 51 to Pittsburgh road, plaintiffs say, gives an incomplete picture of the environmental impact of the Agencies' road building plans, and thus violates NEPA.

Plaintiffs' claims raise an elemental NEPA issue: to what extent NEPA applies to the

---

**8.** The court does not cite the APA in *Township of Springfield. Concord Township* cites the APA, but does not involve review of an EIS; it concerns review of a decision not to prepare an EIS

at all. As the court there notes, this implicates a standard of review based on reasonableness. 625 F.2d at 1073–74.

action in question. The NEPA status of the I–70 to Route 51 road is undisputed; it has been studied and approved by federal agencies and is thus properly before us. Consequently, our first task is to decide whether the actions taken by the Agencies concerning the Route 51 to Pittsburgh project, regardless of the labels the parties have attached to it, constitute a "proposal" for federal agency action. 42 U.S.C. § 4332(2)(C).

Plaintiffs first hurdle is the governing regulations. The term "proposal" is defined at 40 C.F.R. 1508.23: "*Proposal* exists at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23 (1993) (italics in original).[9]

Several alternatives have been identified for the Route 51 to Pittsburgh project, such as intermodal facilities that, for example, might provide connecting bus service; high occupancy vehicle lanes; a toll road; arterial road upgrades; and no action. *See, e.g.,* ARBD 27 at PO–10. Plaintiffs have provided no evidence that this project has been federally approved or has coalesced into the form of a proposal in NEPA terms. Their burden under NEPA certainly includes having to demonstrate that the suspect action has reached the stage where federal court review is justified. There is no funding proposal pending before any agency, nor is there evidence of active preparation to make a decision on alternatives.

The Supreme Court in *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) faced a similar issue: whether a plan for coal development in the Northern Great Plains Region required an EIS for the entire region, when U.S. Department of the Interior plans and studies had considered actions only of a local or national scope. 427 U.S. at 398–99, 96 S.Ct. at 2725.

The Court rejected the court of appeals' formulation of a test of the need for an EIS based on *contemplated* action. "A court has no authority to depart from the statutory language and, by a balancing of court-devised factors, determine a point during the germination process of a potential proposal at which an impact statement *should be prepared.*" 427 U.S. at 406, 96 S.Ct. at 2728 (emphasis in original). The Court went on to explain the test for the proper timing of an EIS, finding that NEPA:

> speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval on the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

*Kleppe,* 427 U.S. at 410 n. 20, 96 S.Ct. at 2730 n. 20 (emphasis in original). The Court stated further that "when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region *are pending concurrently before an agency,* their environmental consequences must be considered together." 427 U.S. at 410, 96 S.Ct. at 2730 (emphasis added).

■ The Court's expression of the need to consider related actions in the same EIS is not lost on us, but neither is the Court's direction on how to determine the relatedness of two or more projects for NEPA purposes. The Court clings firmly to the notion that a proposal requiring an EIS is a creature actually pending before a federal agency. Thus if a project is only "contemplated" or "less imminent," it does not merit inclusion in an EIS.[10]

**9.** FHWA regulations take much the same approach. "Action" is defined as "A highway or transit project proposed for FHWA or UMTA funding." 23 C.F.R. § 771.107(b) (1993). "The provisions of this regulation and the CEQ regulation apply to actions where the [Federal Highway] Administration exercises sufficient control to condition the permit or project approval. Actions taken by the applicant which do not require Federal approvals, such as preparation of a regional transportation plan are not subject to this regulation." 23 C.F.R. § 771.109(a)(1) (1993).

**10.** The Court went even further in *Kleppe.* Even when several related proposals are actually pending before an agency, the agency might properly

"Until there has been a 'proposal,' and until there has been a 'recommendation or report' on that proposal, there is no requirement for an EIS.... The 'proposal' requirement, then, is a statutory requirement grounded in the language of Section 102(2)(C) of NEPA that governs the time when an EIS should be prepared." *Save Barton Creek Ass'n v. Federal Highway Administration,* 950 F.2d 1129, 1136 (5th Cir. 1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).

*Save Barton Creek* involved an 82 mile circumferential freeway around Austin, Texas, that had been divided into five segments for planning and construction. The Fifth Circuit considered whether one segment had been improperly divorced from the rest. It was important to the court that the segments of the loop were to be constructed at different times over a period of years; the project was not one uninterrupted construction effort.

The court found that the loop had not reached the stage where it could be considered a federal proposal. The district court thus had "incorrectly elevated the [Federal Highway Administration's] early coordination process to the status of a 'proposal' under NEPA." 950 F.2d at 1136. The court added:

> Major construction projects, like the Austin Outer Loop, customarily change in design, cost, scope, and impact over the years required for development. The segments of the Austin Outer Loop are planned to be constructed at different times in the future over a period of many years. Furthermore, the financing, specific location, and construction timing of other segments are subject to change. More important, some segments of the Austin Outer Loop may never be built. In essence, the construction of an outer loop around Austin is, at

most, a contemplated action, which at this point exists only as a concept in a long range plan that is subject to constant revision. The record is silent with regard to any meaningful federal participation or control exercised over the project in this case.

*Save Barton Creek,* 950 F.2d at 1137. These observations apply squarely to the project contemplated from Route 51 to Pittsburgh, even though there is undisputed federal participation in the I–70 to Route 51 road.

The Fifth Circuit had previously resolved the dilemma about when to consider the environmental impact of a particular project. "NEPA does not require an agency to restate all of the environmental effects of other projects presently under consideration. Where the underlying data base includes *approved projects* and *pending proposals,* the 'statutory minima' of NEPA has been met." *Piedmont Heights,* 637 F.2d at 441 (emphasis added).

A case finding in favor of a NEPA challenge further highlights the proper interpretation of "proposal." In *Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976) (en banc), the plaintiffs sued to enjoin construction of a 15 mile segment of a proposed 42 mile freeway. The EIS was confined to the 15 mile segment, leading the plaintiffs to claim the project was illegally divided. The court agreed that the segmentation was improper, but under facts that conclusively distinguish *Swain* from this case: it was "clear that under the facts of this case, the proposed federal action being taken includes funding the entire 42 miles of" the highway. *Id.* at 368. There is no such federal funding of the Route 51 to Pittsburgh highway, despite the firm belief in previous years by all parties involved that there would be.

The Agencies have not studied the total impact [11] of the Route 51 to Pittsburgh pro-

approve one project without a cumulative EIS; if other related projects are later approved, the agency could consider the cumulative impact of the first at that time. 427 U.S. at 414 n. 26, 96 S.Ct. at 2733.

Citing *Kleppe,* the Fifth Circuit has stated that "each element of the plan *when proposed* will be subject to such analysis, and as we have held, the analysis at that time should take into consider-

ation any prior approved projects which affect the environment as part of the existing background of the proposal." *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 438 (5th Cir.1981) (emphasis added).

11. The Agencies have studied the traffic impact of the I–70 to Route 51 road two miles north of the terminus on Route 51. They have also stud-

ject because it has not, in NEPA terms, been proposed. To study now the impact of a road from Route 51 to Pittsburgh runs an almost certain risk that the information will be outdated by the time decisionmakers might actually use it. The "gestation period," as the Agencies call it, of a new highway serving the Mon Valley took twenty-five years. For obvious reasons (e.g., commonality of location and persons involved), the history of that road may be a fair approximation of the possibilities of the Route 51 to Pittsburgh project. On the other hand, it may not be. The uncertainty that attends these decisions is exactly the point. Requiring a cumulative impact study in the face of these many unknowns makes little sense.

Performing two studies, now and in the future, would be duplicative, wasteful, and would further complicate a process that is already detailed and comprehensive. Nor do we find it contemplated by NEPA. We have run across no evidence about the shelf-life of an EIS. Though it may be determinable, we feel uncompelled to pursue it because we are convinced that decisionmakers should have the most current information when considering the impact of the various alternatives for the Route 51 to Pittsburgh project. A study performed now is not likely to bear that quality.

■ Plaintiffs fall back on an assertion that the future action need not be proposed, but only reasonably foreseeable, relying on 40 C.F.R. § 1508.7.[12] We disagree with plaintiffs' interpretation, given the plain terms of NEPA and their application above. In further support, they contend that an I–70 to I–376 route was approved by the Pennsylvania legislature, and that the FHWA's 1989 notice of intent to prepare an EIS described a project from I–70 to Pittsburgh. They also cite current planning for the Route 51 to Pittsburgh project as proof that it is reasonably foreseeable. Pls' Reply Br. at 2–4.

In plain terms, this appears to be hook on which plaintiffs seek to hang their first NEPA claim. They argue in essence that Agencies should not be permitted to change a decision once made; and that the environmental impacts of all related projects—"related" being the operative word we must define—must be studied, if not built, at the same time. The sense that political influence has improperly influenced this process is also apparent in plaintiffs' arguments.

■ APA rules of review and precedent cited herein demonstrate that altering transportation projects in mid-stream is not in itself prohibited by NEPA. *See, e.g., Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294 (D.C.Cir.1987). NEPA also places discernible limits on which projects must be considered together for their cumulative impact. *See Kleppe.* And it does not prohibit what can be called political influence in certain aspects of the process, such as decisions on the broad choice of alternatives. To the contrary, NEPA invites participation which can be described as political in its opportunities for public comment, open to individuals or groups of any stripe, on federal projects. As stated above, if the NEPA's minimum requirements are followed, we are prohibited from interfering in the administrative process.

■ In sum, we have before us a project that includes one road ready to be built, and one transportation link of undecided geography, dimensions, and deadlines. The reason this latter project is not a "proposal" is the same reason it is not "reasonably foreseeable": the Route 51 to Pittsburgh project, born when the Agency officials changed their minds, simply has not progressed to the point where it must be considered under NEPA now. This is so despite its future possible incarnation as a road connected to the northern endpoint of the I–70 to Route

---

ied and made plans to mitigate the effects of the additional traffic the new road will add to Route 51. ARBD 27 at IV–9 to IV–13.

**12.** This subsection states in full:

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past,

present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7 (1993) (italics in original).

51 project. Just as there must be some point in time that separates a non-NEPA contemplated action from a bona fide NEPA proposal, there must be some point in time that separates a project under study from one that is reasonably foreseeable. The interplay of these closely related words in this context surely taxes their common meaning. Given the controlling and guiding interpretations of NEPA we have reviewed, however, we find that a reasonably foreseeable project is one in a form similar to a proposed project. The "reasonably foreseeable" language should not be permitted to contradict the CEQ's own definition of "proposal," 40 C.F.R. § 1508.23, which requires active preparation of a decision by a federal agency, or FHWA's definition of "action," 23 C.F.R. §§ 771.107(b), 771.109(a)(1). We thus find that 40 C.F.R. § 1508.7 entitles plaintiffs to no relief.

### C. Whether the Agencies Were Required to Consider Cumulative Impact

It is difficult to escape the conclusion that plaintiffs' cumulative impact claim is precluded by the absence of a proposal for federal action for the Route 51 to Pittsburgh project. Nonetheless, to account for the contention that the proposed major federal action (the I–70 to Route 51 road) and the future action are so closely related that they should be considered together in one EIS,[13] we review plaintiffs' cumulative impact claims [14] below.

As mentioned above, plaintiffs assert that the Agencies wrongly divided the expressway project into two segments, the road from I–70 to Route 51 and the project from Route 51 to Pittsburgh. This act of segmentation is said to violate NEPA because the Agencies

as a consequence failed to consider the cumulative impact of the Route 51 to Pittsburgh road in the EIS for the I–70 to Route 51 road. Plaintiffs rely on two federal regulations and case law in seeking to demonstrate this type of NEPA violation.

"Segmentation of a large or cumulative project into smaller components in order to avoid designating the project a major federal action has been held to be unlawful." *New Jersey Dept. of Env'l Protection v. Long Island Power Authority*, 30 F.3d 403, 411 (3d Cir.1994), quoting *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 240 (3d Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981). Where there is no dispute about the existence of major federal participation, such as here, segmentation of a large project for other reasons, such as to exclude potentially objectionable environmental factors, is likewise unlawful. *Piedmont Heights*, 637 F.2d at 439. Broadly stated, " '[s]egmentation' or 'piecemealing' occurs when an action is divided into component parts, each involving action with less significant environmental effects." *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2nd Cir.1988).

Segmentation analysis has its exceptions. "[T]he rule against segmentation is not required to be applied in every situation." *Piedmont Heights*, 637 F.2d at 439; *accord Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C.Cir.1987). The court in *Piedmont Heights* goes on to cite the three factors now contained in 23 C.F.R. § 771.111(f), in addition to a prohibition against irretrievably committing federal funds to closely related projects, as a test for improper segmentation.[15]

**13.** While not conclusive evidence of relatedness, plaintiffs' claim is lent credence by the fact that one federal agency, the United States Fish and Wildlife Service, favored an environmental impact study of the entire I–70 to Pittsburgh corridor. ARBD 32 at 5; ARBD 28 at VIII–35. The remaining federal and three state agencies support the project as set forth in the FEIS.

In addition, we note that the court of appeals in *Save Barton Creek*, 950 F.2d at 1140, went on to carry out a segmentation analysis even though it had already found the absence of federal involvement to trigger NEPA's requirements.

**14.** In many of the cases cited by the parties, and certainly in this case, cumulative impact and segmentation claims are different sides of the same coin, segmentation being the term used to describe the positive act of dividing related projects, and failure to consider cumulative impact being the corresponding act of omission. We consider the claims to have the same prospective legal consequences in this case: the possibility of remand to the Agencies for additional study.

**15.** As stated by the court:

To determine the appropriate scope for an EIS courts have considered such factors as whether

In support of their cumulative impact claim, plaintiffs assert that the EIS must comply with both the FHWA's regulation at 23 C.F.R. 771.111(f), and the CEQ's rule at 40 C.F.R. 1508.25.

### 1. *FHWA Regulations*

The relevant FHWA regulation provides that:

(f) In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f) (1993).[16] Plaintiffs invoke the first and third of these subsections.

### a. *Logical Termini*

■ Plaintiffs argue that the City of Pittsburgh is the logical northern terminus, or endpoint, for this project.[17] They further contend that the current northern terminus on Route 51 is illogical, thus rendering the Agencies' decision to empty the expressway onto Route 51 fatally flawed. Pls' Br. at 32, Doc. No. 27.

Plaintiffs' assertions have some merit. The City of Pittsburgh is the dominant economic, demographic, and cultural feature of the region. Given unrestricted options about where to build this expressway, it is not possible to deny the sense of linking the proposed expressway with Pittsburgh as a bona fide alternative. The administrative record until 1992 confirms as much, when the Agencies' plans were based on such an option.

■ But here we are met squarely with the limitations to our powers of review, given the changes in the Agencies' plans since 1992. We have no authority to choose Agency transportation goals, nor can we forbid the Agencies from changing their minds. "That a terminus is the most logical is not mandated by the segmentation analysis—that analysis requires only that a terminus be 'logical.'" *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1483 (10th Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991). We do not deny—nor do the Agencies—that an endpoint for the expressway in the City of Pittsburgh is one logical choice. We unequivocally find, however, that that choice is validly confined to the Agencies, and may include a choice other than the City of Pittsburgh.

"'Termini' include crossroads, population centers, major traffic generators, or similar

---

the proposed segment (1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects. *Piedmont Heights*, 637 F.2d at 439.

**16.** Courts routinely cite and follow these FHWA regulations in segmentation cases, but they have not been described as mandatory. *See, e.g., Coalition on Sensible Transportation, Inc. v. Dole*, 826 F.2d 60, 68 (D.C.Cir.1987) (a "number of courts have relied on the *same or closely similar factors* in their segmentation determinations," without actually citing this regulation itself) (emphasis added); *Save Barton Creek*, 950 F.2d at 1140 and n. 15 ("Segmentation becomes suspect ... only after an evaluation of *such factors as*" those "embodied" in the FHWA's regulations) (emphasis added); *Dickman v. City of Santa Fe*, 724 F.Supp. 1341, 1345 (D.N.M.1989) ("A num-

ber of factors" which courts have considered in segmentation analysis "derive from" 23 C.F.R. 771.111(f)). The FHWA regulations echo the four factors identified in *Piedmont Heights*, with the exception of the "irretrievable commitment of federal funds" element of the test.

Courts still cite the *Piedmont Heights* factors, alone or with the FHWA regulations, in describing agency responsibility to consider impacts from related projects. *See, e.g. Save Barton Creek*, 950 F.2d at 1140; *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298–99 (D.C.Cir. 1987).

The court reviews this background chiefly for the sake of clarity. Plaintiffs ultimately rely only on 23 C.F.R. § 771.111(f)(1) and (3).

**17.** Plaintiffs do not challenge the validity of the southern terminus.

highway control elements." *Conserv'n Law Found'n v. Federal Highway Admin'n,* 24 F.3d 1465, 1472 (1st Cir.1994). Despite the obvious differences between the features of a "crossroads" and those of a "population center," each of them nonetheless may qualify as logical endpoints for highway projects. This is as it should be, given our country's need for a modern, nationwide, interconnected system of highways. As in the *Conservation Law Foundation* case, plaintiffs here have cited no authority restricting highway termini to major metropolitan areas. In *Save Barton Creek,* the plaintiffs asserted that the endpoint of the segment would obviously restrict the form and location of the roads that would attach to it at either end. The court rejected this contention essentially for the lack of proof that any segment would not be functional on its own, finding that the regulations required no more. 950 F.2d at 1142.

Plaintiffs argue strenuously that the northern terminus of the expressway is not logical because it will add 7,400 vehicles per day to the already congested Route 51. Pls' Br. at 32. This is acknowledged in the FEIS. ARBD 27 at PO–15.

Again, that factor may lower the status of the northern terminus on the scale of logic; we cannot say that it strips the Route 51 terminus of all logic. First, the 7,400 vehicle figure is a 24 hour, two way figure, with about 370 vehicles in each direction added to existing Route 51 north of the new road in the peak travel hour. ARBD 27 at PO–15; AR 44 at 2541–42. Second, only 12% of traffic spilling onto Route 51 is expected to reach downtown Pittsburgh or the Oakland area, although 33% of this traffic is destined for all of Pittsburgh. ARBD 27 at PO–15; ARBD 26 at 31. It does give the Court pause to read that Route 51 is recognized as already operating "at or near capacity along most of its length north of the proposed interchange." ARBD 27 at IV–9; AR 24 at 2542. The suggestion in the FEIS and by one of the Commission's consultants that the congestion may not be much worsened by the Mon/Fayette traffic because more vehicles will choose alternate routes to avoid the new congestion seems debatable at best. ARBD 27 at IV–9 to IV–10; AR 44 at 2542–43.

We are always wary of affording conclusive weight to any single observation, however, given the broad scope of environmental impact studies, and the limited number of choices agencies have for placing roads. But more importantly, the Agencies have planned measures to help reduce the added congestion. One measure is a park-and-ride lot for expanded bus service and car- and vanpools. Others include improvements to Route 51 itself, such as adding a center turning lane to match the five lane configuration on upper Route 51, improving intersections, and coordinating traffic signals. As result, traffic on Route 51 is not expected to degrade. AR 42 at 767–83, 1293; AR 44 at 2499–2503; AR 62 at 1726–28; 1762–67.

Given the consideration of this issue by the Agencies and the actions planned, we cannot say that the decision to link the road from I–70 to Route 51 is illogical.

 b. *Restriction on Consideration of Alternatives*

███ Plaintiffs next argue that if construction of the I–70 to Route 51 road is allowed to proceed, the southern terminus of the Route 51 to Pittsburgh project will be finally determined. Road planners will then be unable to avoid areas of high subsidence, or the Clairton Sportsmen's Club's unique property. The most serious threat they perceive appears to be the unknown significant impacts that will remain unknown if the area is not studied. Pls' Br. at 35.

Plaintiffs' concern with potential subsidence stems from a conclusion drawn from the Corridor Feasibility Study, ARBD 1. A diagram indeed shows an area designated as having potentially high subsidence because of the presence of old coal mines near the northern end of the I–70 to Route 51 road. *See* Pls' Br. at 35, 45–46, and Ex. D.

This is a prime example of an issue which is appropriately committed to agency discretion. The record shows that the Agencies acknowledged this issue. ARBD 27 at IV–75 to IV–86. Given this recognition, plaintiffs have cited no evidence that the risk of subsidence is insurmountable by known engineering solutions. Without such information, we are ill-equipped to question the Agencies'

implicit conclusion that subsidence risks can be mitigated.[18]

As for the interference with the Clairton Sportsmen's Club property, the Court has in its office file a letter dated October 12, 1994 (after plaintiffs filed their main brief) from the president of the Club withdrawing as a plaintiff. No withdrawal motion has been filed with the Clerk, however. The withdrawal is based on assurances from the Commission that Club property would not be affected, and recites that plaintiffs' counsel was informed about the withdrawal.[19] This issue gives all indications of being moot. Even if it is not, there is no evidence that the Club's property is significantly more important than other private property that will be affected by the road such that NEPA requires additional study of alternatives around it.

In sum, the present configuration of the I–70 to Route 51 road certainly restricts some alternatives to the extent that its siting has now been fixed. We find that these restrictions are an inevitable result of the choice made, that the choice is valid under NEPA, and the resulting restrictions are the type that can be expected from any such decision. In this regard we find helpful the Fifth Circuit's decision in *Save Barton Creek.* The court found that one segment of a road did not dictate the construction of any other segment—despite its existence as one portion of a loop roadway—the size of any other segment, or the alignment of the rest of the loop. 950 F.2d at 1142.

### 2. *CEQ Regulations*

Plaintiffs also invoke CEQ regulations in challenging the sufficiency of the EIS. They assert that these rules also compel consideration of the Route 51 to Pittsburgh project in the EIS because construction of the two roads are either connected actions, cumulative actions, or similar actions, as defined by the regulations.

The CEQ regulations treat the scope of EIS's as follows:

*Scope* consists of the range of actions, alternatives and impacts to be considered in an environmental impact statement.... To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

. . . . .

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement....

40 C.F.R. § 1508.25 (1993) (italics in original). "These regulations were made binding on all agencies by Executive Order No. 11991, 3 C.F.R. 123 (1978), and are entitled to substantial deference even if they conflict with another agency's interpretation of NEPA." *New Jersey Dept. of Env'l Prot'n*

---

**18.** "Judges are neither scientists nor technicians; if judicial review of agency decisionmaking is to be productive and profitable, courts must insist that litigants provide them with sufficient information and analysis to assess critically the validi-

ty of the allegedly improper agency action." *Lower Alloways Creek Township v. Public Service Elec. & Gas Co.,* 687 F.2d 732, 743 (3d Cir.1982).

**19.** The Court will order the letter filed.

*v. Long Island Power Authority*, 30 F.3d 403, 409 n. 9 (3d Cir.1994) (citations omitted).[20]

### a. *Connected Action*

■■■ Plaintiffs argue the connectedness of the I–70 to Route 51 and the Route 51 to Pittsburgh roads by conclusorily asserting that economic revitalization of the Mon Valley is impossible without a road that leads to the City of Pittsburgh, and does so now. They cite no supporting case authority.

"The proper test to determine relatedness under 40 C.F.R. § 1508.25(a)(1)(iii) is whether the project has independent utility." *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2nd Cir.1988).[21] In *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C.Cir.1987), the D.C.Circuit reviewed the independent utility and logical termini of a four mile segment of a subway system that had begun as an eighteen mile project in downtown Los Angeles. The plaintiffs there claimed only that the entire subway system as originally planned must be considered in the EIS, and that the four mile project was improperly segmented from the whole. In rejecting this claim, the court of appeals referred to unrebutted evidence that the subway, even in its much-abbreviated form—extending only 22% of the distance originally contemplated—had independent utility and logical endpoints. For example, the court found that the subway would link the main railroad terminal with a busway; connect other light rail systems; intersect other bus lines; improve access from densely populated areas to the central business district; and cut travel time through the central business district by one-fourth. 819 F.2d at 299.

The court recognized that the four mile segment "has always been, and still is, envisioned as the first leg of a larger system," *id.*, but found that plaintiffs had failed to provide evidence that failure to consider the

entire system would lead to a misleading view of the environmental impact. The court went on to add that

> transit officials must have some flexibility in meeting the public transportation demands of a large metropolitan area. Large public transportation projects, such as the one involved here, are in the planning and development stage over a long period of time. Officials need flexibility to allow for modifications to meet unforeseen developments, including the availability of state and federal funding.

819 F.2d at 299–300. We find that the same observations apply to highway projects, even if they are located outside major metropolitan areas.

As noted above, the decision in *Save Barton Creek*, 950 F.2d 1129, involved one segment of an 82 mile circumferential freeway around Austin, Texas, that had been divided into five segments for planning and construction. The segment was found to have independent utility because it improved access to business, residential, and recreational areas through intersecting roads, among other reasons. *Id.* at 1142.

Another example of independent utility analysis is found in *Hudson River Sloop Clearwater, Inc. v. Dept. of Navy*, 836 F.2d 760 (2nd Cir.1988). There the plaintiffs challenged a Navy decision to locate a berth for the U.S.S. Iowa battleship group on Staten Island, New York, as well as 1700 housing units for the personnel who worked in the group. In examining the Navy's action for connectedness under 40 C.F.R. § 1508.25(a)(1)(iii), the court of appeals found that, "given the district court's factual finding that the Navy will proceed with the operational aspects of the homeport with or without the housing, it is clear that the two actions are not interdependent under subdivi-

**20.** Compare *Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Commission*, 869 F.2d 719, 725 (3d Cir.1989), where the Third Circuit "determined that the CEQ guidelines are not binding on an agency that has not expressly adopted them." *See also Lower Alloways Creek Township v. Public Service Electric & Gas Co.*, 687 F.2d 732, 740 (3d Cir.1982) (CEQ regulations are "guidance" in interpreting NEPA language).

**21.** Thus, the element of the FHWA regulations that plaintiffs did not specifically challenge is included in the analysis under the CEQ regulations, which obviously overlap in their application. *See* 23 C.F.R. § 771.111(f)(2).

sion (iii), since the operational aspect of the homeport has the requisite independent utility." *Id.* at 764. The court thus found that the housing and operational aspects of the homeport need not have been considered in a single EIS.

It is undoubtedly easier to compare the independent utility of a battleship berth and the housing that accompanies it because each serves notably different purposes. Comparing the independent utility of roads is more difficult because they all serve a fairly uniform set of purposes, primarily access, convenience, development, and safety. Moreover, because virtually all roads connect to other roads, it is not as easy to identify *independent* utility, unless one were to find that all roads, short of ones that end in the middle of a wasteland, have independent utility. The consequence of this difficulty, as we interpret it from the case law, is that the test for independent utility is a flexible one.[22]

These decisions applying the "connected action" test firmly demonstrate that I–70 to Route 51 road has independent utility by meeting the needs identified by the agencies, and does not depend on a larger action for its justification. This road will replace poor, slow, unsafe roads so that goods and services will move faster through the area. It will link major highways where no such linkage now exists. It will relieve present and future congestion on the currently inadequate roads serving the area. It will improve vehicle and pedestrian safety. It will make social and emergency services more accessible. By achieving these goals, it will contribute to economic redevelopment of the area. ARBD 27 at ES–2.

Plaintiffs, of course, have a different view about the road's ability to support economic development of the region. They argue that businesses north of Route 51 deserve attention, and that for the economic potential of

the entire region to be realized, the I–70 to Route 51 road must connect to Pittsburgh.

Plaintiffs' arguments have appeal in general, but they do not completely coincide with the goals of the I–70 to Route 51 road as selected by the Agencies, which are empowered to set the goals. We find persuasive support for the goals of the road as planned in the presence of the intervenors from the Mid–Mon Valley. Their appearance and argument, though not part of the administrative record, confirm portions of the administrative record: that even this divided road has legitimate purposes and is expected to benefit an appreciable number of communities, businesses, and individuals.

Accordingly, given the objectives of this project, seen in context, as a whole, and apart from any other road construction, plaintiffs have conclusively failed to establish that the I–70 to Route 51 project lacks independent utility.

### b. *Cumulative Actions*

▮ Plaintiffs' attempt to transform the efforts of the Cumulative Impact Subcommittee formed by the agencies into a violation of 40 C.F.R. § 1508.25(a)(2). They claim that the information the agencies gathered about the effects of the expressway on the City of Pittsburgh and the greenfield areas of northern Washington County demonstrate that there are cumulative impacts of a Route 51 to Pittsburgh road that must be considered now.

Plaintiffs cursory treatment of this topic does not convince us that the regulation requires consideration of what are referred to here as cumulative impacts. First, they run into the obstacle of the regulatory requirement that cumulative actions involve proposed actions, as that term is defined therein. 40 C.F.R. § 1508.23. Plans for the Route 51 to Pittsburgh project do not meet that defini-

---

22. As the D.C. Circuit has found,

 [I]t is inherent in the very concept of a highway network that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility. The proper question is whether one project will serve a significant purpose even if a second related project is not built.

*Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 69 (D.C.Cir.1987). *See also Save Barton Creek,* 950 F.2d at 1142 ("All proposed highways, when constructed, must eventually connect to an existing highway. Every roadway section that is added to a highway network is dependent upon and connected to the rest of the network.").

tion. While the analysis of independent utility under 40 C.F.R. § 1508.25(a)(1), above, allows—indeed requires—the court to examine one segment of allegedly related actions, review of cumulative impact under section 1508.25(a)(2) inescapably requires the existence of two or more proposals. It is dispositive that there is no other proposed action, the impacts of which to consider cumulatively. In sum, the agencies cannot be faulted for not considering cumulative impacts together because they do not know what form the Route 51 to Pittsburgh project will take.

The interrupted efforts of the Cumulative Project Impact Subcommittee do not convince us otherwise. Other than the U.S. Fish and Wildlife Service, the other Agencies and project participants agreed on the advisability of dividing the Mon/Fayette Project into four parts. It does not appear that the Agencies' willingness to consider cumulative impacts was transformed into a condition for issuance of the FEIS. (Recall that one of the reasons for dividing the project was to avoid the gross conclusions of a seventy mile Mon/Fayette Corridor study in favor of the finer detail of four studies of the component areas.) As noted above, we review the record for adherence to the statutory minima. The presence of some disagreement among the Agencies, even on the need to study cumulative impacts, does not negate the validity of the FEIS.

### c. Similar Actions

Plaintiffs' argument that the proposed project and the future one which link the City of Pittsburgh are similar actions under 40 C.F.R. § 1508.25(a)(3) has no more merit than those rejected above. While this subsection includes consideration of reason-ably foreseeable as well as proposed actions, we find that phrasing no more persuasive in determining whether the Agencies are acting arbitrarily in not having studied the Route 51 to Pittsburgh project already. In any event, this subsection contains permissive language, and thus is committed to agency discretion. For the reasons stated above, we find no relevant abuse of discretion in applying this subsection to the Agencies' decision.

### D. Consideration of Route 51 South Upgrade

Plaintiffs' second major NEPA challenge against the Agencies is that they failed to fully consider an alternative to the route ultimately chosen.[23] The alternative they cite is a project improving Route 51 South. They assert that this project is reasonable on a variety of grounds: it is less expensive than the I–70 to Route 51 road; it will preserve farmland; it will reduce the danger from mine subsidence; it may reduce the loss of residents and businesses from the City of Pittsburgh; it would fare better on a cost-benefit comparison of transportation projects in the region; and would avoid disrupting Jefferson Borough. Having these reasonable qualities, they contend, it was unreasonable for the Agencies not to consider it in detail. In their reply brief, plaintiffs also strongly disagree with the goals of the expressway identified by the Agencies. They argue that the Agencies improperly confine their goals to the Mid–Mon Valley, rather than considering the region as a whole.

There is no dispute that the consideration of alternatives is a vital part of the NEPA process. The dispute lies in whether the Route 51 South upgrade qualifies as an alter-

---

**23.** Intervenors challenge plaintiffs' preservation of this issue, citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978). *Vermont Yankee* cautions courts against allowing manipulation of these types of claims by commentators who half-heartedly raise questions during the administrative process, and then claim in court that the agency did not fully consider the alternatives they "raised." *See Lake Erie Alliance*, 526 F.Supp. at 1072.

The forcefulness with which the plaintiffs raised the Route 51 South upgrade alternative is indeed questionable. It appears that the only time this option was suggested to the Agencies outside of general public comment was in a November 2, 1992 letter from Raymond Reaves, Director of the Allegheny County Planning Department, to the Commission. See Pls' Supplement to Administrative Record, Doc. No. 29, Ex. 3. It is not clear whether or to what extent plaintiffs pursued this suggestion. Nevertheless, because this suggestion was communicated directly to the Commission by a person in a position intimately related to transportation planning, we will review plaintiffs' claim.

native that should have been considered in detail.

■ The Supreme Court stated that "the concept of alternatives [under NEPA] must be bounded by some notion of feasibility." *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. at 1215. "NEPA's requirement of a discussion of alternatives ... should be superintended according to a 'rule of reason.'" *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988); *Coalition for Canyon Preserv'n v. Bowers*, 632 F.2d 774, 783 (9th Cir.1980). Stated another way, "The degree to which an existing alternative should be considered, or indeed whether an alternative should be considered at all, varies with existing circumstances." *Piedmont Heights*, 637 F.2d at 436. The "rule of reason necessarily governs *which* alternatives the agency must discuss, and the *extent* to which it must discuss them." *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C.Cir.) (emphasis in original), *vacated in part as moot*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978). Reasonableness is measured by whether it achieves the goals the Agencies set out to achieve. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C.Cir.1991), *cert. denied*, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).

Route 51 is aligned in a southeast-northwest direction in relation to the Mon Valley communities which are said to benefit from the expressway. It is approximately 10 miles east of these Mon Valley communities. The Route 51 South upgrade as an alternative was not wholly overlooked by the Agencies; rather, it was not seen as a reasonable alternative to the expressway given the goals of the project. It thus was not studied in detail in the FEIS. In response to various public comments suggesting this alternative, the FEIS states:

> Use of Route 51 from I–70 to Jefferson Borough was not considered a reasonable alternative to meet the project area transportation needs. Route 51 is already a four-lane highway within this area, but does not draw traffic from the project

area. It is too far east to serve the north-south transportation demands of the project area. It does not contribute to solving congestion, safety, and access problems in the project area. Route 51 does not serve the transportation needs of the communities on the west side of the Monongahela River.

ARBD 28 at VIII–21.[24]

Indeed, a similar option had been disfavored years before. In the February 1988 Corridor Feasibility Study, only one of what were described as the initial corridors was dismissed from further consideration at that time. See ARBD 1 at 11 and Fig. 2.

> [T]his corridor began at the proposed interchange at I–70; however, it travelled north a short distance before turning east to cross the Mon River just south of Monongahela City. From there it continued north on the east side of the Mon River and followed the Route 48 corridor up to an interchange and terminus at I–376 (Figure 2).

> After coordination with the Steering Committee, this corridor alternative was dismissed for the following reasons: The east side of the Monongahela River is largely undeveloped which does not maximize economic development and redevelopment opportunities. In addition, placement of the expressway on the east side of the Mon River does not provide access to the majority of Mon Valley Communities hoping to benefit from proximity to the expressway.

*Id.* The route identified in Figure 2 does not exactly track Route 51 South. It nonetheless intersects with Route 51 South on the east side of the Mon River. The comments that disqualified this route thus apply with similar force to the Route 51 South alternative now at issue.

In the face of these spare but relevant considerations, plaintiffs now challenge the Agencies' goals for the expressway and their failure to consider various advantages offered by a route they failed to consider. This is a

---

24. CEQ regulations provide that, "for alternatives which were eliminated from detailed study, [agencies shall] briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (1993).

red flag for the Court. *Lake Erie Alliance,* 526 F.Supp. at 1070. We have no power to choose the Agencies' transportation goals. Nor are we convinced that plaintiffs' selective quotations from the FEIS about regional effects of the highway fairly represent a commitment to an undefined "region," when the FEIS is considered as a whole and in context. Pls' Reply Br. at 10–11.

The Court likewise is in no position to weigh the various advantages allegedly offered by the Route 51 South upgrade alternative. To do so would require a relative assessment of the reasonableness of the alternatives the Agencies *did* consider in detail. This would bear too strong a resemblance to the process the Agencies already carried out to fall within the Court's province. The record contains direct information that the Route 51 South alternative would not advance the Agencies' goals.[25] A "proposed alternative is reasonable only if it will bring about the ends of the federal action.... The goals of an action delimit the universe of the action's reasonable alternatives." *Citizens Against Burlington,* 938 F.2d at 195.

Given the conclusions above, the matter is effectively foreclosed in our view by the absence of any information that the Route 51 South alternative was improperly dismissed. Instead, it appears to have been one of the unremarkable casualties of an administrative process that was open to nearly all suggestions at the beginning, resulted in inevitable weeding out, and was constrained by the inescapable limits of time, money, and people. We thus find that, given the Agencies' choice of transportation goals, the Route 51 South upgrade was not a reasonable alternative that NEPA required the Agencies to consider.

## II. *ISTEA*

Plaintiffs next statutory challenge to the Agencies' actions arises under a provision of the Intermodal Surface Transportation Efficiency Act. Plaintiffs contend that two studies required of the Agencies by ISTEA—a

Congestion Management System ("CMS") evaluation and a Major Investment Study ("MIS," also referred to as Major Investment Analysis, "MIA")—were approved without public involvement. They maintain that FHWA's decision to allow the Commission to forego preparation of a separate MIS was arbitrary and capricious. They also contend that the CMS so lacks merit that it is a sham.

### A. *Statutory and Regulatory Background*

ISTEA was enacted to reduce fuel consumption and air pollution and to encourage an "intermodal transportation system"—that is, one based on travel by means other than cars carrying one person. 23 U.S.C. § 134(a). In pursuit of these goals, urban areas with populations above 200,000 have been designated as transportation management areas. *Id.* § 134(i)(1). For federally funded transportation projects, metropolitan planning organizations within these areas must develop a CMS. The CMS affects such projects through requirements for the consideration of "travel demand reduction and operational management strategies." *Id.* at § 134(i)(1). Significantly for the case at hand, this subsection expressly permitted the Secretary of Transportation to establish a schedule for phasing-in these requirements. *Id.*

Plaintiffs zero in on the subsection of ISTEA which states:

> Notwithstanding any other provisions of this title or the Federal Transit Act, for transportation management areas classified as nonattainment for ozone or carbon monoxide pursuant to the Clean Air Act, Federal funds may not be programmed in such area for any highway project that will result in a significant increase in carrying capacity for single occupant vehicles unless the project is part of an approved congestion management system.

23 U.S.C. § 134(*l*). The area around Pittsburgh has been classified as a moderate nonattainment region for ozone under the Clean

---

**25.** The Third Circuit once found that "[t]he four-volume FEIS itself attests to the attention paid to alternatives and mitigative measures." *Town-*

*ship of Springfield,* 702 F.2d at 442. We make a similar observation about the two-volume FEIS submitted in this case.

Air Act. AR 49 at 1809. Consequently, a federally-funded highway that will improve travel conditions for cars carrying one person, such as the I–70 to Route 51 road, must be part of a CMS.

To assist compliance with ISTEA and pending formal rulemaking, the FHWA published Interim Guidance for FHWA field offices and state transportation agencies. 57 Fed.Reg. 14943 (April 23, 1992). The Interim Guidance sets forth the requirements for interim CMS's and, for our purposes, shows that CMS requirements were being implemented gradually. *Id.* at 14947–48. On December 1, 1993, the FHWA issued regulations setting out the requirements for the various transportation management and monitoring systems required by ISTEA, including traffic congestion management. 23 C.F.R. § 500.501–500.509 (1994). These regulations include a compliance schedule, which requires a state to develop a work plan for congestion management by October 1, 1994. Full operation of the work plan and use of the CMS need not be achieved until October 1, 1995, however. *Id.* § 500.509(a). Until October 1, 1995, interim CMS requirements at 23 C.F.R. § 450.336(b) (1994) apply to highway projects that increase capacity for single occupant vehicles. *Id.* § 500.509(b)(1). We thus look to section 450.336(b) for the regulations that ultimately govern the Agencies' conduct with regard to the Mon/Fayette Project.

Section 450.336(b) establishes the phase-in procedures for the new congestion management schemes. Projects like the I–70 to Route 51 road may not "advance beyond the NEPA process unless an interim CMS is in place that meets the criteria in paragraphs (b)(1) and (b)(2) of this section and the project results from this interim CMS." *Id.* § 450.336(b)(3). Subsection 450.336(b)(1) provides that the most serious problems in the metropolitan area must be identified in the interim CMS, and that plans be developed to address these problems. Subsection 450.336(b)(2) provides further that interim CMS's must analyze "travel demand reduction and operational management strategies." This analysis must consider whether such strategies can replace a plan to build a road for single occupant vehicles. If the analysis

finds that such strategies cannot serve as a substitute for the road, then planners must go as far as possible in incorporating such strategies into the road project. If there are other strategies appropriate for the transportation corridor but not for the road project itself, the state and affected metropolitan planning organization must commit to implement these by the time road construction is completed. Car- and vanpools must be a part of this commitment.

### B. *Public Participation in the CMS and MIS Processes*

#### 1. *CMS*

Plaintiffs argue first that the regulations also require public involvement in the CMS process. They cite 23 C.F.R. § 450.316(b), which is part of the regulation defining the elements of the metropolitan transportation planning process. Subsection 450.316(b)(1) provides for comprehensive, proactive public involvement in the metropolitan transportation planning process, including timely public notice, full public access to key decisions, opportunity for public comment, public distribution of information about transportation issues, and the like. They also note that commenters were informed by the Agencies that the Project complied with section 450.316. ARBD 27 at VIII–438.

Like the NEPA requirements we reviewed above, the provisions of ISTEA that concern the Mon/Fayette Project are unmistakably procedural. We therefore examine them to decide only if the procedures were followed.

The Agencies recognized their obligations to comply with ISTEA in mid–1993, and considered the Act's requirements in the Supplemental DEIS issued in September 1993. ARBD 21 at II–1 to II–7. A public hearing on the SDEIS was held October 14, 1993. Three volumes of public and private comments and testimony from the hearing, including some on ISTEA's requirements, are collected in the record. ARBD 22, ARBD 23, ARBD 24. Public meetings on the CMS were held in December 1993 and January 1994. David McGuirk, a representative of plaintiff Jefferson United, and Davitt Woodwell, an attorney with the Pennsylvania Envi-

ronmental Council, attended both meetings. AR 45 at 3526; AR 47 at 622. The study and meetings resulted in a seventy-page CMS evaluation adopted on January 31, 1994. AR 47 at 1033–1035. The CMS evaluation is in the record at ARBD 26. The final CMS recommendations were incorporated into the FEIS approved February 23, 1994. ARBD 27 at II–25 to II–35. The FEIS was open to public comment at a meeting on March 16, 1994. ARBD 32 at 5.

 It is apparent that there were opportunities for public participation in consideration of the CMS. Plaintiffs complain about the degree of public opportunity to comment. The first relevant legal issue, however, is whether the public participation requirements of section 23 C.F.R. § 450.316 were mandatory for the interim CMS evaluation. We find that they were not.

First, the FHWA in the decision on which this case is based stated that "there are no specific requirements for public involvement regarding CMS under the interim regulations." ARBD 32 at 5. Since the regulations in question are issued by the FHWA, we must accord its interpretation substantial deference.

We find this interpretation reasonable. The congestion management provision of IS-TEA expressly provides for a phase-in of requirements. 23 U.S.C. § 134(i)(3). The regulations establish this phase-in, the final step of which does not occur until October 1, 1995. 23 C.F.R. § 500.509. The interim regulations on congestion management which control this case do not mandate public involvement in the interim CMS process. As plaintiffs point out, 23 C.F.R. § 450.316(b) comprehensively addresses public participation, but in a section that by its own terms deals with the general metropolitan transportation planning process.

We find the terms of the specific congestion management regulations controlling. Applying the public participation requirements of section 450.316(b) to a project that was well under way before that regulation

was issued is akin to imposing retroactive rules.[26] This seems incongruous with the expressed provision for a phase-in.

The Agencies' efforts to provide opportunities for public participation in the CMS process where none is required by the regulations do not trigger the application of rules which do not otherwise bind them. If that were true, agencies could change the terms of rules simply by their conduct. "That the [agency] may have done more than was necessary to comply with the regulation, however, is no reason to enlarge the regulatory requirements." *Hudson River Sloop Clearwater, Inc. v. Dept. of Navy*, 836 F.2d 760, 764 (2d Cir.1988).

### 2. *MIS*

 Plaintiffs make the same public participation argument with regard to the alleged regulatory requirement for a major investment study of the project.

As part of the metropolitan transportation planning process, 23 C.F.R. § 450.318(a) (1994) requires that major investment studies be made on the "design concept and scope of the investment," investment meaning the transportation project being considered. Section 450.318(b) provides for an interagency process to decide what to put in the study and who will perform it; it also provides for public participation in this process consistent with section 450.316(b)(1), which we examined above. Section 450.318(i) states that "[w]here the environmental process has been initiated but not completed, the FHWA and the FTA shall be consulted on appropriate modifications to meet the requirements of this section." While plaintiffs acknowledge the existence of this latter provision in their brief, they ignore its effect.

Again, the environmental review process for the I–70 to Route 51 road was nearing completion by the time these regulations took effect. The Agencies thus were entitled to rely on the FHWA's decision to determine the extent to which they were required to

---

**26.** "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this

result." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988).

perform the MIS. Thirty-five agency representatives, but apparently no plaintiffs or members of the public, met to consider the need for MIS on January 24, 1994. Given the degree of study already being undertaken and the project's progress to that date, the FHWA representative determined that a separate MIS would not be required. Instead, the Agencies agreed to include a section on MIS compliance in the FEIS. ARBD 28 at Appendix D, Memo dated Jan. 24, 1994 entitled Formal Screening Meeting, Major Metropolitan Transportation Investment Analysis.

The FEIS includes a section on compliance with 23 C.F.R. § 450.318. ARBD 27 at I–19 to I–26. This section identified alternatives considered, listed the twenty-eight Agency and public meetings on the project, identified seven travel demand reduction and operational management strategies, and identified documentation in the EIS that demonstrated compliance with MIA. *Id.* As mentioned above, a public hearing was held on March 16, 1994 and a comment period opened to receive public input on the FEIS. Two-hundred-and-eighty people attended the meeting. All comments were published and answered in the basis report for the FHWA's record of decision. ARBD 33.

As regards plaintiffs' specific criticism, we find that it has no more merit than the public participation argument rejected above. Indeed, the terms of public participation on the MIS are governed by language in section 450.318(b) that refers back to section 450.316(b)(1). Section 450.316(b)(1) does not apply to projects already in progress. In any event, given the discretion accorded the FHWA under the regulations to modify the MIS process, and the steps actually taken in carrying out a modified form of compliance, we find the Agencies' action reasonable. Section 450.318 did not compel the FHWA to require a separate MIS.

### C. *Validity of CMS Evaluation*

 Finally, plaintiffs take issue with the contents of the CMS evaluation. They contend that the CMS is a sham because it contributes to an already serious congestion problem on Route 51.[27] The Agencies are said to further compound the problem by not giving this problem a high priority, as the regulations require.

The interim CMS process does require the identification of "the most serious congestion problems in the metropolitan area" and "development of actions to address these problems." 23 C.F.R. § 450.336(b)(1). Couched in this language is a substantial amount of discretion. We described above how the Agencies acknowledged the congestion on Route 51 North and the steps they plan to mitigate further congestion from the I–70 to Route 51 road. The record also contains an October 1993 CMS progress report that identifies many congested roads in the metropolitan area. AR 69 at 38–55. We have reviewed the final CMS evaluation that contains travel demand reduction and operational management strategies; analysis of alternatives to the planned highway; commitments for transportation improvements that do not involve new highway construction; and consideration of future CMS regional strategies. ARBD 26. Under our guiding standard of review, we do not find the Agencies' actions related to the CMS arbitrary, capricious, an abuse of discretion or contrary to law.

### CONCLUSION

The environmental impact review process under NEPA for federally funded projects is a complex undertaking that must reconcile, as best as possible, dozens of competing interests. It demands a high level of technical expertise. ISTEA adds greater scrutiny of national transportation goals to this process. The process does not result in perfection,

---

27. We recognize, as defendants point out, the inconsistency of plaintiffs' indictment of the traffic conditions on Route 51 North. Earlier in their brief plaintiffs argued in favor of an upgrade of Route 51 South as an unstudied alternative to the I–70 to Route 51 road. Route 51 South carries vehicles to the same congested Route 51 North. This observation drains some significance from their allegation of the seriousness of the congestion problem.

and can generate legitimate disagreement, even with the most studied of outcomes.

The court is in no better position than the agencies to reconcile these competing interests. We have a limited role in measuring the process against minimum statutory and regulatory requirements. Having done so here, we find that the defendants did not violate NEPA, ISTEA, or their associated regulations with regard to the I–70 to Route 51 project.

An appropriate order will be entered.

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| ARBD and AR | Administrative Record |
| CEQ | Council on Environmental Quality |
| COMMISSION | Pennsylvania Turnpike Commission |
| CMS | Congestion Management System |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FHWA | U.S. Department of Transportation, Federal Highway Administration |
| ISTEA | Intermodal Surface Transportation Efficiency Act |
| MIA | Major Investment Analysis |
| MIS | Major Investment Study |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| SDEIS | Supplemental Draft Environmental Impact Statement |

## ORDER

For the reasons stated in the accompanying opinion, plaintiffs' request for final injunctive relief is DENIED, and defendants' motion for summary judgment (Doc. No. 30) is GRANTED. The Clerk is directed to mark this case closed.